# CHARLTON v. KELLY, SHERIFF OF HUDSON COUNTY, NEW JERSEY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

No. 232.   Argued April 18, 1913.—Decided June 10, 1913.

The rule that a writ of *habeas corpus* cannot be used as a writ of error applies to extradition proceedings; and if the committing magistrate had jurisdiction and there was competent evidence as to commission of the crime his decision may not be reviewed on *habeas corpus*.

The accused in an extradition proceeding has not the right to introduce evidence simply because it would be admissible on the trial on plea of not guilty, nor is this right given by § 3 of the act of August 3, 1882.

Section 3 of the act of August 3, 1882, does not make evidence relevant, legal or competent which would not theretofore have been competent on a proceeding in extradition.

The proceeding in extradition before the examining magistrate is not a trial, and the issue is not the actual guilt, but whether there is a *prima facie* case sufficient to hold the accused for trial.

There is not, nor can there be, a uniform rule as to admission of evidence for the accused in an extradition proceeding.

An examining magistrate may exclude evidence as to insanity of the accused; such evidence is in the nature of defense and should be heard at the trial or on preliminary examination in the jurisdiction of the crime.

Construing the supplementary treaty of extradition with Italy of 1884

in the light of the original treaty of 1882 and of § 5270, Rev. Stat., it is not obligatory thereunder that the formal demand should be proven in preliminary proceedings within forty days after the arrest.

In this case it appears that every requirement of the law, whether treaty or statute was substantially complied with.

The word "persons" etymologically considered includes citizens as well as those who are not; and while it is the practice of a preponderant number of nations to refuse to deliver its own citizens under a treaty of extradition silent on the point specifically, *held*, in view of the diplomatic history of the United States, there is no principle of international law by which citizens are excepted from the operation of a treaty to surrender persons where no such exception is made in the treaty itself. The United States has always so construed its treaties.

The construction of a treaty by the political department of the Government, while not conclusive upon a court called upon to construe such a treaty in a matter involving personal rights, is of great weight.

While a violation of the extradition treaties with Italy of 1882 and 1884 by that power might render the treaty denounceable by the United States, it does not render it void and of no effect; and so *held* that the refusal of Italy to surrender its nationals has not had the effect of abrogating the treaty but of merely placing the Government in the position of having the right to denounce it.

A government can waive violations of a treaty by the other party, and it remains in force until formally abrogated.

Where, as in this case, the Executive has elected to waive any right to free itself from the obligation to deliver its own citizens under an existing extradition treaty, it is the duty of the court to recognize the obligation to surrender a citizen thereunder as one imposed by the treaty as the supreme law of the land.

185 Fed. Rep. 880, affirmed.

THIS is an appeal from a judgment dismissing a petition for a writ of *hàbeas corpus* and remanding the petitioner to custody under a warrant for his extradition as a fugitive from the justice of the Kingdom of Italy.

The proceedings for the extradition of the appellant were begun upon a complaint duly made by the Italian Vice-Consul, charging him with the commission of a murder in Italy. A warrant was duly issued by the Hon. John A. Blair, one of the judges of New Jersey,

qualified to sit as a committing magistrate in such a proceeding, under § 5270, Rev. Stat. At the hearing, evidence was produced which satisfied Judge Blair that the appellant was a fugitive from justice and that he was the person whose return to Italy was desired, and that there was probable cause for holding him for trial upon the charge of murder, committed there. He thereupon committed the appellant, to be held until surrendered under a warrant to be issued by the Secretary of State. A transcript of the evidence and of the findings was duly certified as required by § 5270, Rev. Stat., and a warrant in due form for his surrender was issued by the Secretary of State. Its execution has, up to this time, been prevented by the *habeas corpus* proceedings in the court below and the pendency of this appeal.

The procedure in an extradition proceeding is that found in the treaty under which the extradition is demanded, and the legislation by Congress in aid thereof. Thus, Article I of the treaty with Italy of March 23, 1868 (vol. 1, Treaties, Conventions, etc., of the United States, 1910, p. 966), reads as follows (p. 967):

"The Government of the United States and the Government of Italy mutually agree to deliver up persons who, having been convicted of or charged with the crimes specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other: Provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial, if the crime had been there committed."

One of the crimes specified in the section following, is murder.

By Article V it is provided, that:

"When, however, the fugitive shall have been merely

charged with crime, a duly authenticated copy of the warrant for his arrest in the country where the crime may have been committed, or of the depositions upon which such warrant may have been issued, must accompany the requisition as aforesaid. The President of the United States, or the proper executive authority in Italy, may then issue a warrant for the apprehension of the fugitive, in order that he may be brought before the proper judicial authority for examination. If it should then be decided that, according to law and the evidence, the extradition is due pursuant to the treaty, the fugitive may be given up according to the forms prescribed in such cases."

That article was amended by the additional treaty of June 11, 1884 (vol. 1, Treaties and Conventions, pp. 985, 986), by a clause added in these words:

"Any competent judicial magistrate of either of the two countries shall be authorized after the exhibition of a certificate signed by the Minister of Foreign Affairs [of Italy] or the Secretary of State [of the United States] attesting that a requisition has been made by the Government of the other country to secure the preliminary arrest of a person condemned for or charged with having therein committed a crime for which, pursuant to this Convention, extradition may be granted, and on complaint duly made under oath by a person cognizant of the fact, or by a diplomatic or consular officer of the demanding Government, being duly authorized by the latter, and attesting that the aforesaid crime was thus perpetrated, to issue a warrant for the arrest of the person thus inculpated, to the end that he or she may be brought before the said magistrate, so that the evidence of his or her criminality may be heard and considered; and the person thus accused and imprisoned shall from time to time be remanded to prison until a formal demand for his or her extradition shall be made and supported by evidence as above provided; if, however, the requisition, together with the documents

above provided for, shall not be made, as required, by the diplomatic representative of the demanding Government, or, in his absence, by a consular officer thereof, within forty days from the date of the,arrest of the accused, the prisoner shall be set at liberty."

*Mr. R. Floyd Clarke,* with whom *Mr. William D. Edwards* was on the brief, for appellant:

The admitted breach of the treaty presents a question of law and not of diplomacy, as to the respective rights of the Executive and citizen.

On such admitted breach the question is judicial not diplomatic and the judiciary are not foreclosed by the diplomatic construction to the contrary. *United States* v. *Rauscher,* 119 U. S. 407; *Chin Low* v. *United States,* 208 U. S. 8; *Wilson* v. *Wall,* 6 Wall. 83, 89; *In re Cooper,* 143 U. S. 472, 499; *The La Ninfa,* 75 Fed. Rep. 513; 44 U. S. App. 648.

In the absence of a statute or treaty, there is no power in the Executive to extradite criminals under the imperfect obligation of international law. 4 Moore on Int. Law, §§ 580–581; citing numerous cases.

It is not sufficient for a treaty to exist. Under this rule there must be a legal obligation under the treaty to extradite before the Executive can act.

Where the treaty provides that the contracting parties are not bound to deliver citizens, the Executive has no power to deport a citizen. Cases *supra* and *The Trimble Case,* 1 Moore on Ext., § 35, p. 167; 4 Moore on Int. Law, §§ 580 *et seq.; The Benevides Case,* 4 Moore's Int. Law, p. 302; *The Row Case, Id.; Ex parte McCabe,* 46 Fed. Rep. 363.

The treaty, if "persons" is to be construed as a covenant to surrender citizens of the asylum country, has been broken by Italy by the passage of the Italian Penal Code prohibiting the extradition of Italian citizens. Treaties

may be broken by inconsistent· legislative action. *The Chinese Exclusion Cases*, 130 U. S. 581, 599; *The Chinese Deportation Cases*, 149 U. S. 730; 5 Moore's Dig. Int. Law, p. 366, § 776.

· We have exercised the right at least five times. See French Act of 1798, 5 Moore's Dig. Int. Law, pp. 356, 357; *Chinese Exclusion Cases*, 130 U. S. 581, 599; *Chinese Deportation Cases*, 149 U. S. 698, 763; *Edye* v. *Robertson*, 112 U. S. 580, 600 (*Head Money Tax Cases*); *The Exchange Case*, 7 Cranch, 116, 136; 5 Moore's Dig. Int. Law, 357.

Italy has also broken the treaty by· inconsistent executive action in refusing to surrender Italian citizens.

A sovereignty is bound in its international relations by· the action of its executive independent of its legislative powers. *The Prize Cases*, 2 Black, 635; Dana's Wheaton, § 543, note 250, citing 1 Kent, 165; Heffter, § 84, Vattell, LIV, LV, c. 2, § 14; Wharton's Dig. Int. Law, § 131, *a* 11–20; 5 Moore's Dig. Int. Law, § 759, p. 231; 6 Id., p. 1017; Halleck, 854. See arguments of United States in *Mora's Case against Spain*, 6 Moore's Dig. Int. Law, 1017.

· Italy's breach of the covenant to extradite citizens of the asylum country (the American construction assumed to be the correct one for the purpose of this argument) being thus established, there is no treaty obligation on this sovereignty to surrender. There remains under international law an option or arbitrary discretion in the premises. As to who has the option—the sovereignty consisting of executive, judicial and legislative departments—the question is whether in all or in what part of these is vested this option.

Italy having broken her entire and reciprocal covenant in this treaty, the sovereignty of the United States has the option to rescind the treaty for breach; and to insist upon Italy's compliance therewith; this can be done by

war, by arbitration or by acquiescence in the Italian construction.

The Executive cannot exercise the option of affirming by either war or arbitration but it can affirm the treaty, or can disaffirm it, to the extent of refusing Italy's demand a's such action does not violate the constitutional rights of anyone.

The Executive has no power of affirmance by deporting a citizen in the absence of congressional authority.

The Executive has full power to suspend the treaty by reason of the alleged breach until the action of Congress. *The Winslow Case*, U. S. For. Rel. 1876, pp. 204–309; For. Rel. 1877, 271–289; 5 Moore's Int. Law, pp. 321, 322; *United States* v. *Rauscher*, 119 U. S. 407; *The Prize Cases*, 2 Black, 635, 699.

See, also, 1 Willoughby on the Constitution, p. 223, § 518; *Williams* v. *Suffolk Ins. Co.*, 13 Pet. 415; *Gelston* v. *Hoyt*, 3 Wheat. 246, 324; *Kenneth* v. *Chambers*, 14 How. 30; *United States* v. *Trumbull*, 48 Fed. Rep. 99, 104; *The Itata*, 56 Fed. Rep. 505, 510; *The Prize Cases*, 2 Black, 635, 670; Pomeroy on Constitutional Law, §§ 669, 670, 672.

As to the power to recognize the independence of a new, foreign state, see Sen. Doc. No. 56, 54th Cong., 2d Sess.

See also precedent of the extension of the disarmament on the Great Lakes between Great Britain and the United States, 5 Moore on Int. Law, p. 322; *Cross* v. *Harrison*, 16 How. 164.

The act of a head of a department is in contemplation of law the act of the President. *Wolsey* v. *Chapman* (1879), 101 U. S. 755; *Wilcox* v. *Jackson*, 13 Pet. 498, 513; *Runkle* v. *United States* (1887), 122 U. S. 557; *McElrath's Case* (1876), 12 Ct. Cl. 202; *Belt's Case* (1879), 15 Ct. Cl. 107.

The constitutional limitation of due process of law prevents the exercise by the Executive of the arbitrary

discretion so as to deport the citizen. For meaning of due process of law see *Davidson* v. *New Orleans*, 96 U. S. 97; *Giozza* v. *Tiernan*, 148 U. S. 657; *Ekiu* v. *United States*, 142 U. S. 651; *United States* v. *Ju Toy*, 198 U. S. 253; *Chin Low* v. *United States*, 208 U. S. 8; *Yick Wo* v. *Hopkins*, 118 U. S. 356.

These cases show the strength of the "due process of law" clause even as against a discretionary power expressly and properly granted by Congress under the circumstances arising in the matter.

The claim of the Government that the treaty, though broken as a contract, exists as a law binding on the Secretary, cannot be sustained.

The objection is likewise against reason in that although a treaty is a municipal law as well as an international contract, it cannot when broken be any more binding on the nation or the executive head of the nation having this discretion, as a law, than it can be as a contract.

As to the Government's position that appellant's argument assumes that the breach by Italy has abrogated the treaty so far as concerns this government, no such claim is made.

The Executive, under the facts of this case, cannot affirm this Italian treaty in view of its admitted breach, by deporting an American citizen, because in so doing he exercises an arbitrary discretion resting in him to extradite or not to extradite under the circumstances. To allow the Executive to so act is contrary to the constitutional provision protecting a citizen from the exercise by executive officers of such arbitrary discretion, and allowing his "life, liberty and property" to be only affected by "the law of the land."

The demand in this case is not a demand under the treaty, but a demand under international law.

When, in matters of this character, the treaty or statute requires some act to be done based on the presence or

absence of certain formal documents, the existence of such formal documents is jurisdictional—without them the case falls. See *Tucker* v. *Alexendroff*, 183 U. S. 424; *Compton* v. *Alabama*, 214 U. S. 46. Questions of this kind are of law for this court and are not political.

The material part of this formal demand reads as follows:

"Manchester, Mass., July 28, 1910.

Mr. Secretary of State:

Referring to previous communications and in accordance with the provisions of Article V of the Extradition Convention of March 23, 1868, I have the honor to lay before your Excellency a formal request for the extradition of Porter Charlton," etc.

"Montagliari."

By thus referring to former communications, it is seen that Italy refers to communications in which she states that she does not retreat from her position that the word "persons" does not include citizens of the asylum country, and thus knowing Charlton is a citizen of the asylum country she is asking for the extradition on the basis of the power this government has to grant it, but refuses to be bound by any construction of the treaty to the effect that she shall surrender her own citizens.

This word "request" is chosen with nice precision to characterize a request under international comity which this request is, but is the wrong term if, under the facts of this case and the former dispute, rights are claimed by Italy under the treaty.

The form of demand used in this case, a formal untruth as a demand under the treaty and in substance a request under international comity, should not be allowed by this court as the "formal demand" required by the treaty.

Since the right of a citizen is involved and the facts admitted, this is not a question to be foreclosed by the

fiat of the diplomatic construction. *United States* v.
*Rauscher*, 119 U. S. 407.

It follows that the formal request in this case is of no
more effect—not being of the *bona fide* kind required by
the treaty under the circumstances—than if none had
been made.

*Mr. Pierre P. Garven* for appellees.

MR. JUSTICE LURTON, after making the foregoing state-
ment, delivered the opinion of the court.

A writ of *habeas corpus* cannot be used as a writ of error.
If Judge Blair had jurisdiction of the person of the accused
and of the subject-matter, and had before him competent
legal evidence of the commission of this crime with which
the appellant was charged in the complaint, which,
according to the law of New Jersey, would justify his
apprehension and commitment for trial if the crime had
been committed in that State, his decision may not be
reviewed on *habeas corpus*. *Terlinden* v. *Ames*, 184 U. S.
270, 278; *Bryant* v. *United States*, 167 U. S. 104; *Mc-
Namara* v. *Henkel*, 226 U. S. 520.

By a stipulation filed in the case for the purpose of this
review, it is agreed that the evidence presented to Judge
Blair of the murder with which the accused was charged,
and of his criminality was sufficient to meet the treaty and
statutory requirements of the case, and the errors assigned
in this court questioning its legality and competency,
as well as those as to the alleged absence of a warrant or
deposition upon which such warrant was issued, have
been withdrawn. But neither this stipulation, nor the
withdrawal of the assignments of error referred to is to
affect any of the matters raised by other objections
pointed out in other assignments.

The objections which are relied upon for the purpose of

defeating extradition may be conveniently summarized and considered under four heads:

1. That evidence of the insanity of the accused was offered and excluded.

2. That the evidence of a formal demand for the extradition of the accused was not filed until more than forty days after the arrest.

3. That appellant is a citizen of the United States, and that the treaty in providing for the extradition of "persons" accused of crime does not include persons who are citizens or subjects of the nation upon whom the demand is made.

4. That if the word "person" as used in the treaty includes citizens of the asylum country, the treaty, in so far as it covers that subject, has been abrogated by the conduct of Italy in refusing to deliver up its own citizens upon the demand of the United States, and by the enactment of a municipal law, since the treaty, forbidding the extradition of citizens.

We will consider these objections in their order:

1. Was evidence of insanity improperly excluded?

· It must be conceded that impressive evidence of the insanity of the accused was offered by him and excluded. It is now said that this ruling was erroneous. But if so, this is not a writ of error and mere errors in the rejection of evidence are not subject to review by a writ of *habeas corpus. Benson* v. *McMahon,* 127 U. S. 457, 461; *Terlinden* v. *Ames,* 184 U. S. 270, 278; *McNamara* v. *Henkel, supra.* In the *McNamara Case,* certain depositions had been received for the prosecution over objection. This court said that there was legal evidence on which to base the action of the commissioner in holding the accused for extradition, irrespective of the depositions objected to.

But it is said that the act of August 3, 1882, 22 Statutes,

215, c. 378, § 3, requires that the defendant's witnesses shall be heard.  That section is most inartificially drawn.  It reads as follows:

"That on the hearing of any case under a claim of extradition by any foreign government, upon affidavit being filed by the person charged setting forth that there are witnesses whose evidence is material to his defense, that he cannot safely go to trial without them, what he expects to prove by each of them, and that he is not possessed of sufficient means, and is actually unable to pay the fees of such witnesses, the judge or commissioner before whom such claim for extradition is heard may order that such witnesses be subpœnaed; and in such cases the costs incurred by the process, and the fees of witnesses, shall be paid in the same manner that similar fees are paid in the case of witnesses subpœnaed in behalf of the United States."

The contention is that the effect of this provision is to give the accused the right to introduce any evidence which would be admissible upon a trial under an issue of not guilty.  To this we cannot agree.  The prime purpose of the section is to afford the defendant the means for obtaining the testimony of witnesses and to provide for their fees.  In no sense does the statute make relevant, legal or competent evidence which would not have been competent before the statute upon such a hearing.  True, the statute speaks of evidence "material for his defense, without which he cannot safely go to trial," but we cannot discover that Congress intended to depart from the provisions of Article I of the treaty which requires that a surrender shall be made " upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment, if the crime had been there committed."  The provision is common to many treaties, and Congress, by § 5270, Rev. Stat., has, in aid

of such treaties, prescribed the procedure upon such a hearing in these words:

"Whenever there is a treaty or convention for extradition between the Government of the United States and any foreign government, any justice of the Supreme Court, circuit judge, district judge, commissioner, authorized so to do by any of the courts of the United States, or judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within the limits of any State, district, or Territory, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or commissioner, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made."

Judge Blair made the certificate in form and substance in conformity with the statute, and upon the receipt of that, a warrant was duly issued for the surrender of the appellant to the agents of the Italian Government.

In Benson v. McMahon, supra (p. 462) this court said of a similar provision in the treaty with Mexico, in connection with Rev. Stat. § 5270

"Taking this provision of the treaty, and that of the Revised Statutes above recited, we are of opinion that

the proceeding before the commissioner is not to be regarded as in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of those preliminary examinations, which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused, either by imprisonment or under bail, to ultimately answer to an indictment, or other proceeding, in which he shall be finally tried upon the charge made against him. The language of the treaty which we have cited, above quoted, explicitly provides that 'the commission of the crime shall be so established as that the laws of the country in which the fugitive or the person so accused shall be found would justify his or her apprehension and commitment for trial if the crime had been there committed.' This prescribes the proceedings in these preliminary examinations as accurately as language can well do it. The act of Congress conferring jurisdiction upon the commissioner, or other examining officer, it may be noted in this connection, says that if he deems the evidence sufficient to sustain the charge under the provisions of the treaty he shall certify the same, together with a copy of all the testimony, and issue his warrant for the commitment of the person so charged.

"We are not sitting in this court on the trial of the prisoner, with power to pronounce him guilty and punish him or declare him innocent and acquit him. We are now engaged simply in an inquiry as to whether, under the construction of the act of Congress, and the treaty entered into between this country and Mexico, there was legal evidence before the commissioner to justify him in exercising his power to commit the person accused to custody to await the requisition of the Mexican government."

To repeat, the act of 1882 does not prescribe the extent

to which evidence thus obtained shall be admitted, and we quite agree with the view expressed by Judge Brown, in *In re Wadge*, 15 Fed. Rep. 864, who said (p. 866):

"The phrase in § 3 of the act of August 3, 1882 'that he, (the accused) cannot safely go to trial without them,' (witnesses,) cannot be construed as giving a right to a full trial in violation of treaty stipulations; but it must be confined to such a preliminary hearing only as was already allowable under the existing practice, viz, such as is appropriate to a hearing having reference only to a commitment for future trial."

There is not and cannot well be any uniform rule determining how far an examining magistrate should hear the witnesses produced by an accused person. The proceeding is not a trial. The issue is confined to the single question of whether the evidence for the State makes a *prima facie* case of guilt sufficient to make it proper to hold the party for trial. Such committing trials, if they may be called trials in any legal sense, are usually regulated by local statutes. Neither can the courts be expected to bring about uniformity of practice as to the right of such an accused person to have his witnesses examined, since if they are heard, that is the end of the matter, as the ruling cannot be reversed.

In this case the magistrate refused to hear evidence of insanity. It is claimed that because he excluded such evidence, the judgment committing appellant for extradition is to be set aside as a nullity, and the accused set at liberty. At most the exclusion was error not reviewable by *habeas corpus*. To have witnesses produced to contradict the testimony for the prosecution is obviously a very different thing from hearing witnesses for the purpose of explaining matters referred to by the witnesses for the Government. This distinction was taken by Mr. Justice Washington in the case of *United States* v. *White*, 2 Washington C. C. 29, when he said:

"Generally speaking, the defendant's witnesses are not examined upon an application to bind him over to answer upon a criminal charge. The defendant's witnesses are never sent to the grand jury, except where the attorney for the prosecution consents thereto. But in this incipient stage of the prosecution, the judge may examine witnesses who were present at the time when the offence is said to have been committed, to explain what is said by the witnesses for the prosecution; and the cross-examination of the witnesses for the prosecution, is certainly improper."

We therefore conclude that the examining magistrate did not exceed his authority in excluding evidence of insanity. If the evidence was only for the purpose of showing present insanity by reason of which the accused was not capable of defending the charge of crime, it is an objection which should be taken before or at the time of his trial for the crime, and heard by the court having jurisdiction of the crime. If it was offered to show insanity at the time of the commission of the crime, it was obviously a defense which should be heard at the time of his trial, or by a preliminary hearing in the jurisdiction of the crime, if so provided for by its laws. By the law of New Jersey, insanity as an excuse for crime is a defense, and the burden of making it out is upon the defendant. *Graves* v. *State*, 45 N. J. L. 347; *State* v. *Maioni*, 78 N. J. L. 339, 341; *State* v. *Peacock*, 50 N. J. L. 34, 36. A defendant has no general right to have evidence exonerating him go before a grand jury, and unless the prosecution consents, such witnesses may be excluded: 1 Chitty Crim. Law, 318; *United States* v. *White, supra;* *Respublica* v. *Shaffer*, 1 Dallas, 236, 255; *United States* v. *Palmer,* 2 Cranch Circuit Court, 11; *United States* v. *Terry*, 39 Fed. Rep. 355, 362.

2. It is next objected that no formal demand for the extradition of the appellant was made within forty days after his arrest, and that he was therefore entitled to be

set at liberty.   The objection is founded upon the sup-
plemental convention with Italy of 1884, heretofore set
out.

A "certificate," such as was indicated by that conven-
tion, was undoubtedly "exhibited" to the committing
magistrate, and was the basis of his action.   The other
parts of the provision are not clear.   What is referred to
by the phrase, "the requisition, together with the docu-
ments above provided," etc., which is required to be
made within forty days, or the person set at liberty?   The
"certificate" attesting "that a requisition has been made,"
etc., was "exhibited" to Judge Blair; and we fail to find
in this clause of the treaty any requirement that the
subsequent "formal demand" for the extradition shall
be filed with the magistrate within forty days after the
arrest of the accused, or at any other time.   The whole of
the convention should be read together and in connection
with § 5270, Rev. Stat., which is applicable to all treaties.
Under § 5270 any one of the judicial officers named therein,
may, upon complaint, charging one of the crimes named
in the treaty, issue his warrant of arrest and hear, the
evidence of criminality.   This done, his duty is, if he
deems the evidence sufficient to hold the accused for ex-
tradition, to commit him to jail, and to certify his con-
clusion, with the evidence, to the Secretary of State, who
may then, "upon the requisition of the proper authorities
of such foreign government, issue his warrant for the
surrender of the accused."   Rev. Stat., §§ 5272, 5273.   Of
course, the effect of the supplementary treaty of 1884, be-
ing later than the statutory requirements above referred
to, is to supersede the statute in so far as there is a neces-
sary conflict in the carrying out of the extradition obliga-
tion between this country and Italy.   But, as observed in
*Grin* v. *Shine,* 187 U. S. 181, 191, "Congress has a perfect
right to provide for the extradition of criminals in its own
way, with or without a treaty to that effect, and to declare

that foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient. *Castro* v. *DeUriarte,* 16 Fed. Rep. 93. This appears to have been the object of § 5270, which is applicable to all foreign governments with which we have treaties of extradition." This section, by its very terms, applies "in all cases in which there now exists or hereafter may exist, any treaty or convention for extradition." Had there been no law of Congress upon the subject, the method of procedure prescribed by the supplementary treaty of 1884 would necessarily have been the proper one, and the committing magistrate could have proceeded only according to the treaty, for that would have been the only law of the land applicable to the case and the only source of his authority.

It was therefore competent for Judge Blair to act upon the complaint made before him independently of any preliminary mandate or certificate, such as was in fact issued and "exhibited" to him in this case, being plainly authorized so to do by the terms of § 5270. The personal rights of the accused are saved by the provisions of the same section, since he could only have been surrendered upon the warrant of the Secretary of State, based upon the evidence presented upon the hearing, and the conclusion of the sufficiency of the evidence of criminality certified to the Secretary of State, and upon a formal requisition for extradition. *Castro* v. *DeUriarte,* 16 Fed. Rep. 93, 97; *Grin* v. *Shine, supra.*

Construed in the light of the original and supplementary conventions with Italy and of § 5270, Rev. Stat., we do not find that it was obligatory that the "formal demand" referred to in the 1884 clause should be proven in the preliminary proceeding within forty days after the arrest. That is a demand made upon the executive authority of the United States by the executive authority of Italy. Its presentation was not necessary to give the examining magistrate jurisdiction. Such a formal demand

was in fact made on July 28, 1910, less' than forty days after the arrest. That, together with the certificate of the magistrate and the evidence submitted to him, was the authority of law under which the Secretary of State issued his warrant of extradition. Every requirement of the law, whether it appears in the treaty or in the act of Congress, was substantially complied with. This was the construction placed upon the treaty by Mr. Secretary Knox in answer to the same objection made to him before he issued his warrant, and also of Judge Rellstab, who dismissed the petition for a writ of *habeas corpus* and from whose decree this appeal comes.

3. By Article I of the extradition treaty with Italy the two governments mutually agree to deliver up all persons, who, having been convicted of or charged with any of the crimes specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum in the other, etc. It is claimed by counsel for the appellant that the word "persons" as used in this article does not include persons who are citizens of the asylum country.

That the word "persons" etymologically includes citizens as well as those who are not, can hardly be debatable. The treaty contains no reservation of citizens of the country of asylum. The contention is that an express exclusion of citizens or subjects is not necessary, as by implication, from accepted principles of public law, persons who are citizens of the asylum country are excluded from extradition conventions unless expressly included. This was the position taken by the Foreign Minister of Italy in a correspondence in 1890 with the Secretary of State of the United States, concerning a demand made by the United States for the extradition of Bevivini and Villella, two subjects of Italy whose extradition was sought, that they might be tried for a crime committed in this country. Their extradition was refused

by Italy on account of their Italian nationality. The Foreign Minister of Italy advanced in favor of the Italian position these grounds: (a) That the Italian Penal Code of 1890, in express terms provided that, "the extradition of a citizen is not permitted;" (b) That a crime committed by an Italian subject in a foreign country was punishable in Italy, and, therefore, there was no ground for saying that unless extradited the crime would go unpunished; and (c) That it has become a recognized principle of public international law that one nation will not deliver its own citizens or subjects upon the demand of another, to be tried for a crime committed in the territory of the latter, unless it has entered into a convention expressly so contracting, and that the United States had itself recognized the principle in many treaties by inserting a clause exempting citizens from extradition. (United States Foreign Relations 1890, p. 555.) Mr. Blaine, then Secretary of State of the United States, protested against the position of the Italian government and maintained the view that citizens were included among the persons subject to extradition unless expressly excluded. His defense of the position is full and remarkably able. It is to be found in United States Foreign Relations for 1890, pp. 557, 566.

We shall pass by the effect of the Penal Code in preventing the authorities of Italy from carrying out its international engagements to surrender citizens, for that has no bearing upon the question now under consideration, which is, whether under accepted principles of international law, citizens are to be regarded as not embraced within an extradition treaty unless expressly included. That it has come to be the practice with a preponderant number of nations to refuse to deliver its citizens, is true; but this exception is convincingly shown by Mr. Blaine in his reply to the Foreign Minister of Italy and by the thorough consideration of the whole subject by Mr. John

Bassett Moore, in his treatise on extradition, ch. V, pp. 152, 193, to be of modern origin. The beginning of the exemption is traced to the practice between France and the Low Countries in the eighteenth century. Owing to the existence in the municipal law of many nations of provisions prohibiting the extradition of citizens, the United States has in several of its extradition treaties clauses exempting citizens from their obligation. The treaties in force in 1910 may, therefore, be divided into two classes, those which expressly exempt citizens, and those which do not. Those which do contain the limitation are by far the larger number. Among the treaties which provide for the extradition of "persons," without limitation or qualification are the following:

With Great Britain, August 9, 1842, extended July 12, 1889, United States Treaties, 1910, pp. 650 and 740.

With France, November 9, 1843, *supra,* p. 526.

With Italy, February 8, 1868, *supra,* p. 961.

With Venezuela, August 27, 1860, *supra,* p. 1845.

With Ecuador, June 28, 1872, *supra,* p. 436.

With Dominican Republic, February 8, 1867, *supra,* p. 403.

The treaty with Japan of April 29, 1886, *supra,* p. 1025, contains a qualification in these words:

"Art. VII. Neither of the contracting parties shall be bound to deliver up its own citizens or subjects under the stipulations of this convention, but they shall have the power to deliver them up if in their discretion it be deemed proper to do so."

The conclusion we reach is, that there is no principle of international law by which citizens are excepted out of an agreement to surrender "persons," where no such exception is made in the treaty itself. Upon the contrary, the word "persons" includes *all* persons when not qualified as it is in some of the treaties between this and other nations. That this country has made such an exception in some of

its conventions and not in others, demonstrates that the contracting parties were fully aware of the consequences unless there was a clause qualifying the word "persons." This interpretation has been consistently upheld by the United States, and enforced under the several treaties which do not exempt citizens. That Italy has not conformed to this view, and the effect of this attitude will be considered later. But that the United States has always construed its obligation as embracing its citizens is illustrated by the action of the executive branch of the Government in this very instance. A construction of a treaty by the political department of the Government, while not conclusive upon a court called upon to construe such a treaty in a matter involving personal rights, is nevertheless of much weight.

The subject is summed up by Mr. John Bassett Moore in his work on extradition, vol. 1, p. 170, § 138, where he says:

"'Persons' includes citizens. In respect to the persons to be surrendered, the extradition treaties of the United States all employ the general term 'persons,' or 'all persons.' Hence, where no express exception is made, the treaties warrant no distinction as to nationality. Writing on the general subject of the extradition treaties of the United States and the practice thereunder, Mr. Seward said: 'In some of the United States' extradition treaties it is stipulated that the citizens or subjects of the parties shall not be surrendered. Where there is no express reservation of the kind, there would not, it is presumed, be any hesitation in giving up a citizen of the United States to be tried abroad.' Such has been the uniform and unquestioned practice under the treaty with Great Britain of 1842, in which the term 'all persons' is used."

The effect of yielding to the interpretation urged by Italy would have brought about most serious consequences as to other treaties then in force. One of these was the extradition treaty with Great Britain made as far back as

1843. Inasmuch as under the law of that country, as of this, crimes committed by their citizens within the jurisdiction of another country were punishable only where the crime was committed, it was important that the Italian interpretation should not be accepted.

4. We come now to the contention that by the refusal of Italy to deliver up fugitives of Italian nationality, the treaty has thereby ceased to be of obligation on the United States. The attitude of Italy is indicated by its Penal Code of 1900 which forbids the extradition of citizens, and by the denial in two or more instances to recognize this obligation of the treaty as extending to its citizens.

During a preliminary correspondence between the Department of State and the Italian Chargé d'Affaires, in reference to the provisional arrest and detention of the appellant under articles I and II of the treaty, as extended by article II of the additional convention of 1884, Mr. Knox, the then Secretary of State, inquired, "whether or not the Department is to understand that by initiating extradition proceedings for the surrender of this American citizen accused of committing murder in Italy, your Government wishes to be understood as surrendering its view heretofore entertained and as being now willing to adopt as to cases which may hereafter arise between the two Governments, the view that the Extradition Treaties of eighteen sixty-eight, eighteen sixty-nine and eighteen eighty-four between the United States and Italy require the surrender by each Government of any and all persons, irrespective of the nationality, who having been convicted for or charged with commission of any of the crimes specified in the treaty within the jurisdiction of one of the contracting parties shall seek an asylum or be found within the territory of the other, and further and specifically to inquire whether the Government of Italy now proposes as to all cases arising in the future to deliver to the Government of the United States under and in accordance with

the Treaty provisions those Italian subjects who committing crimes in the United States take refuge in Italy."

The reply to this was as follows:

"July 1, 1910.

"MR. SECRETARY OF STATE: By telegram of June 24, last, your Excellency inquired whether in instituting extradition proceedings in the case of Porter Charlton, who confessed having committed murder at Moltrasio, the King's Government intended to depart from the rule, heretofore observed, not to surrender its own subjects and whether it was to be inferred that Italians guilty of an offense committed on American territory, who should take refuge in Italy, should hereafter be delivered without fail to the American Government.

"I now have the honor to inform your Excellency that the King's Government cannot depart from the principle established by our law that our nationals cannot be surrendered to foreign powers. Furthermore, this principle does not conflict with the provisions of the Extradition Convention. Indeed it seems logical that so far as parity in the matter of extraditing their respective citizens or subjects is concerned, each party should, in the absence of specific provisions in the Convention itself, be guided by the spirit of its own legislation.

"The Italian law does not consent to the extradition of nationals, but the Italian courts are competent to try on the request of a foreign Government, their nationals who may have committed offenses on that Government's Territory.

"Contrariwise, the laws of the United States by not permitting local tribunals to try American citizens for offenses committed abroad seem to admit of their being extradited. Otherwise an offender would, under the egis of the law itself, escape the punishment he deserves.

"I have the honor to inform your Excellency that the requisite extradition papers in the case of Porter Charlton

will be forwarded to me without delay and in the meanwhile I beg you kindly to cause the prisoner to be held in provisional detention."

On July 28, 1910, the following communication was addressed to the Secretary of State, and was received on July 30, 1910:

"MR. SECRETARY OF STATE: Referring to previous communications and in accordance with the provisions of Article V of the Extradition Convention of March 23, 1868, I have honor to lay before your Excellency a formal request for the extradition of Porter Charlton who has confessed the crime of murder committed on the person of his own wife at Moltrasio, Como, which crime is specified in Article II, Section 1 of the said Convention.

"Your Excellency has already been so good as to forward to me, in note No. 864 of June 28 last, the preliminary certificate of arrest provided by Article II of the Additional Convention of June 11, 1884, with a view to the provisional arrest of the above named accused.

"In support of this request, I have the honor to transmit herewith to Your Excellency the record of proceedings conducted by the Court of Como in the case of the aforesaid murder. The papers are regularly visæd by the Embassy of the United States at Rome.

"Awaiting the Federal 'warrant' and the kind return of the enclosed papers for submisssion to the competent court, I avail myself of this opportunity to renew to Your Excellency, together with my thanks in advance, the assurance of my highest consideration."

To this the Secretary of State, after the conclusion of the hearing before Judge Blair and the receipt by the Department of his judgment and the evidence produced before him, replied as follows:

"WASHINGTON, December 10, 1910.

"EXCELLENCY: In compliance with the request made by your Embassy in its note of July 28 last, and in pursu-

ance of existing treaty stipulations between the United States and Italy, I have the honor to enclose a warrant of surrender in the case of Porter Charlton, charged with murder committed within the jurisdiction of the Kingdom of Italy, and examined and committed for surrender by the Honorable John A. Blair, Judge of the Court of Common Pleas in and for the County of Hudson, in the State of New Jersey.

"Accept, Excellency, the renewed assurance of my highest consideration."

The attitude of the Italian Government indicated by proffering this request for extradition "in accordance with Article V of the Treaty of 1868," is, as shown by the communication of July 1st set out above, substantially this,—

First. That crimes committed by an American in a foreign country were not justiciable in the United States, and must, therefore, go unpunished unless the accused be delivered to the country wherein the crime was committed for trial.

Second: Such was not the case with Italy, since under the laws of Italy, crimes committed by its subjects in foreign lands were justiciable in Italy.

Third: That as a consequence of the difference in the municipal law, "it was logical that so far as parity in the matter of extraditing their respective citizens or subjects is concerned, each party should, in the absence of specific provisions in the Convention itself, be guided by the spirit of its own legislation."

This adherence to a view of the obligation of the treaty as not requiring one country to surrender its nationals while it did the other, presented a situation in which the United States might do either of two things, namely: abandon its own interpretation of the word "persons." as including citizens, or adhere to its own interpretation and surrender the appellant, although the obligation had,

as to nationals, ceased to be reciprocal. The United States could not yield its own interpretation of the treaty, since that would have had the most serious consequence on five other treaties in which the word "persons" had been used in its ordinary meaning, as including *all persons*, and, therefore, not exempting citizens. If the attitude of Italy was, as contended, a violation of the obligation of the treaty, which, in international law, would have justified the United States in denouncing the treaty as no longer obligatory, it did not automatically have that effect. If the United States elected not to declare its abrogation, or come to a rupture, the treaty would remain in force. It was only voidable, not void; and if the United States should prefer, it might waive any breach which in its judgment had occurred and conform to its own obligation as if there had been no such breach. 1 Kent's Comm., p. 175.

Upon this subject Vattel, page \*452, says:

"When the treaty of peace is violated by one of the contracting parties, the other has the option of either declaring the treaty null and void, or allowing it still to subsist; for a contract which contains reciprocal engagements, cannot be binding on him with respect to the party who on his side pays no regard to the same contract. But, if he chooses not to come to a rupture, the treaty remains valid and obligatory."

Grotius says (book 3, ch. 20, par. 38):

"It is honourable, and laudable to maintain a peace even after it has been violated by the other parties: as Scipio did, after the many treacherous acts of the Carthaginians. For no one can release himself from an obligation by acting contrary to his engagements. And though it may be further said that the peace is broken by such an act, yet the breach ought to be taken in favour of the innocent party, if he thinks proper to avail himself of it."

In Moore's International Law Digest, Vol. 5, page 566, it is said:

"A treaty is primarily a compact between independent nations, and depends for the enforcement of its provisions on the honor and the interests of the governments which are parties to it. If these fail, its infraction becomes the subject of international reclamation and negotiation, which may lead to war to enforce them. With this judicial tribunals have nothing to do."

In the case of *In re Thomas*, 12 Blatchf. 370, Mr. Justice Blatchford (then District Judge) said:

"Indeed, it is difficult to see how such a treaty as that between Bavaria and the United States can be abrogated by the action of Bavaria alone, without the consent of the United States. Where a treaty is violated by one of the contracting parties, it rests alone with the injured party to pronounce it broken, the treaty being, in such case, not absolutely void, but voidable, at the election of the injured party, who may waive or remit the infraction committed, or may demand a just satisfaction, the treaty remaining obligatory if he chooses not to come to a rupture."

In the case of *Terlinden* v. *Ames*, 184 U. S. 270, 287, the question was presented whether a treaty was a legal obligation if the state with whom it was made was without power to carry out its obligation. This court quoted with approval the language of Justice Blatchford, set out above, and said (p. 285):

" And without considering whether extinguished treaties can be renewed by tacit consent under our Constitution, we think that on the question whether this treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance."

That the political branch of the Government recognizes the treaty obligation as still existing is evidenced by its action in this case. In the memorandum giving the rea-

sons of the Department of State for determining to surrender the appellant, after stating the difference between the two governments as to the interpretation of this clause of the treaty, Mr. Secretary Knox said:

"The question is now for the first time presented as to whether or not the United States is under obligation under treaty to surrender to Italy for trial and punishment citizens of the United States fugitive from the justice of Italy, notwithstanding the interpretation placed upon the treaty by Italy with reference to Italian subjects. In· this connection it should be observed that the United States, although, as stated above, .consistently contending that the Italian interpretation was not the proper one, has not treated the Italian practice as a breach of the treaty obligation necessarily requiring abrogation, has not abrogated the treaty or taken any step looking thereto, and has, on the contrary, constantly regarded the treaty as in full force and effect and has answered the obligations imposed thereby and has invoked the rights therein granted. It should, moreover, be observed that even though the action of the Italian Government be regarded as a breach of the treaty, the treaty is binding until abrogated, and therefore the treaty not having been abrogated, its provisions are operative against us.

"The question would, therefore, appear to reduce itself to one of interpretation of.the meaning of the treaty, the Government of the United States being now for the first time called upon to declare whether it regards the treaty as obliging it to surrender its citizens to Italy, notwithstanding Italy has not and insists it can not surrender its citizens to us. It should be observed, in the first place, that we have always insisted not only with reference to the Italian extradition treaty, but with reference to the other extradition treaties similarly phrased that the word 'persons' includes citizens. We are, therefore, committed to that interpretation. The fact that

we have for reasons already given ceased generally to make requisition upon the Government of Italy for the surrender of Italian subjects under the treaty, would not require of necessity that we should, as a matter of logic or law, regard ourselves as free from the obligation of surrendering our citizens, we laboring under no such legal inhibition regarding surrender as operates against the government of Italy. ⸴ Therefore, since extradition treaties need not be reciprocal, even in the matter of the surrendering of citizens, it would seem entirely sound to consider ourselves as bound to surrender our citizens to Italy even though Italy should not, by reason of the provisions of her municipal law be able to surrender its citizens to us."

The executive department having thus elected to waive any right to free itself from the obligation to deliver up its own citizens, it is the plain duty of this court to recognize the obligation to surrender. the appellant as one imposed by the treaty as the supreme law of the land and as affording authority for the warrant of extradition.

*Judgment affirmed.*