**In the Matter of the Extradition of Samuel SHAPIRO, a fugitive from Justice of the State of Israel.**

**No. 72 Cr. Misc. 1.**

United States District Court,
S. D. New York.

Jan. 8, 1973.

---

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y. by Michael B. Mukasey, Asst. U. S. Atty., Murray Stein, Extradition Atty., Dept. of Justice, Washington, D. C., for the United States.

Leon Wildes, New York City, Miller, Cassidy, Larroca & Lewin, Washington, D. C., for respondent by Nathan Lewin and William H. Jeffress, Jr., Washington, D. C., of counsel.

## OPINION

POLLACK, District Judge.

Shmuel Shapira,[1] an alleged fugitive from the State of Israel, has been charged there with the crimes of conspiracy to defraud, fraud, use of fraudulent documents, forgery, deceit, theft and false entry. Israel demands his extradition in accordance with a Convention on Extradition between the governments of the United States of America and of the State of Israel. December 10, 1962 [1963] 14 U.S.T. 1708–14, T.I. A.S. No. 5476.

A complaint charging Shapira with those crimes was filed with this Court on November 30, 1972 and a warrant for his arrest was issued thereon. Pursuant to 18 U.S.C. § 3184 he was brought before this Court for a hearing on December 4, 1972. His counsel requested an adjournment and his release on bail pending the hearing, which were granted. Shapira was at this time the subject of pending proceedings in the Southern District of New York by the Immigration authorities. He is an Israeli citizen and is in this country on a visitor's visa. He had appeared voluntarily at the offices of the Immigration and Naturalization Service in the Southern District of New York and was there served with its warrant for his arrest. He was released on bail pending the proceedings of the Immigration Service; these had not been completed when the complaint seeking his extradition was filed.

Prior to the commencement of the extradition hearing, Shapira sought a mandamus from the Court of Appeals against this Court requiring it to dismiss the extradition complaint, or, alternatively, to transfer the proceeding to the Eastern District of New York pursuant to 28 U.S.C. § 1406(a). Shapira also sought to obtain an order from the Court of Appeals staying the commencement of the hearing. These applications were denied and the hearing was thereupon held on December 21st and 22nd 1972. Decision was reserved and the parties requested and received time to file briefs.

The evidence presented at the hearing, consisting of documents furnished by Israel and the explanation thereof by Shapira from the witness stand, are sufficient to establish probable cause to believe that Shapira committed crimes in Israel which are extraditable within the provisions of the Convention between the United States and the State of Israel.

## I.

### The background for the Charges

Shmuel Shapira is a rabbi, a law graduate and knowledgeable in finance and in securities. In about 1966, perceiving a shortage of money in Israel and a high demand by banks for invest-

1. Referred to in the title hereof as "Samuel Shapiro".

ment deposits, Shapira organized a private company in Tel Aviv, Shahal Investment Company, Ltd., to do financial broking for a commission, i. e., to direct moneyed investors to banks and insurance firms seeking deposits of investors' funds. He advertised in the press that opportunities existed to invest monies at a high rate of interest with a bank guaranty of repayment. This seemingly brought interested persons to his doors.

The legal limit payable by banks in Israel for such loans was 11%. The loans were made to subsidiaries of the selected banks for short periods, usually for six months, and the investor received a letter of guaranty of repayment from the bank. Upon maturity, extensions of the loan could be arranged on like terms. For his services in directing such business to the bank selected by him, Shapira received a 3% commission from the bank which he then "split" with the investor, giving the latter 2% and keeping 1% for himself and thus providing a 13% yield for the customer. Interest and the commission and the kick-back to the customer were all paid in advance, at the inception of the loan.

After a few months, Shapira's customers presumably were not satisfied with a 13% return on their investments, so Shapira approached insurance companies whose interest payment limit was higher than that of banks, with the result that similar business, accompanied by an insurance company guaranty of repayment at maturity, realized for the customer 14 or 15 per cent on their investments, inclusive of the commission kick-back from Shapira.

These activities continued from 1966 to 1968. In the latter year, Shapira became associated with Shalom Blumberg, a former employee of a bank.

They organized Shahak Investment Fund, Ltd., Shaham Investment Fund, Ltd. and Otzar Merkazi, Ltd., in each of which Shapira owned 55% of the stock and Blumberg owned 45% of the stock; both were the active directors.

Seemingly, the activity initially was like that conducted previously by Shapira, i. e., financial broking for a commission from the institutions which received the money. However, customers would be steered to invest their money in Shaham or other private companies against a guarantee by Otzar Merkazi. Shaham invested in foreign securities with the money provided by such customers. Shaham paid the interest to the customers and a commission to Shahak. The customer would be conditioned by a recital of various banks with whom business had been done and the rates of interest they paid and then Otzar Merkazi was included as paying a higher rate, similar to what private firms would pay.

Otzar Merkazi's business stationery announced that they were Bank's Brokers and carried an ambiguous reference to a company connected with Hapoel Hamizrachi, the religious party in Israel. Persons doing business with Otzar Merkazi testified that they were led to believe that they were dealing with and guaranteed as to repayment by a bank or an affiliate of a bank; or that Otzar Merkazi's guaranty was essentially the guaranty of Hapoel Hamizrachi. The fact that Otzar Merkazi was the personal company of Shapira and Blumberg with little or no assets was allegedly concealed from the investors. In short, it is now claimed by the investors that they were led to believe that Otzar Merkazi was something other than it was. As may be surmised, the loans soured and Otzar Merkazi became bankrupt.

Shapira and Blumberg were both criminally indicted and were given bail pending a trial. Shapira left Israel for this country and his extradition to Israel is sought by these proceedings. Meanwhile, Blumberg was separately tried and convicted in Israel on November 28, 1972.

Israel conducted Court proceedings in which complaining witnesses were heard and their evidence and exhibits recorded.

This evidence together with the charges against Shapira and the proceedings in Court looking to bring the case to trial in Israel, including the ultimate finding that Shapira had left and was a fugitive resulting in the order for his arrest, form the content of most of the duly certified and authenticated record (Exhibits 1 and 2) presented to support the extradition complaint herein.

## II.

### The Treaty obligation

The United States covenanted with Israel to deliver up persons found in its territory who have been charged with specified offenses committed in Israel. The included offenses are (among others): Larceny; Obtaining money by false pretenses; Fraud by a banker or agent; Forgery; and Conspiracy to commit any of the foregoing if punishable by imprisonment exceeding three years. Participation in any of those offenses is likewise extraditable. However, if prosecution for such an offense would be barred by lapse of time according to our laws or if the offense or purpose of the extradition is found to be political in character, extradition shall not be granted.

The request for extradition must describe the person sought, state the facts of the case and the text of the applicable law as well as the punishment prescribed and the law relating to limitations of time for the offense.

A request for extradition to the United States from Israel of a person not yet convicted must also be accompanied by a warrant of arrest issued by an Israeli Judge or commissioner and by such evidence as, according to the laws of the United States, would justify his arrest if the offense had been committed here. However, extradition shall be granted, if the accused has not yet been tried, only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, to justify his committal for trial if the offense of which he is accused had been committed in that place.

The judicial documents and the evidence given under oath in Israel must be admitted in evidence on the extradition hearing in the United States when they bear the Israeli Judge's signature or attestation or are authenticated by the official seal of the Israeli Ministry of Justice and, in any case, are certified by the principal diplomatic or consular officer of the United States in Israel. A certified translation of the Israeli record from the Hebrew into the English language must accompany the supporting documents.

All of the foregoing formal requirements and conditions are satisfied by the evidence placed before this Court. The conspiracy charge comes within the ambit of extradition and none of the charges are barred by lapse of time under either Israeli law or applicable New York law. And it has not been credibly established that the Charge or the purpose of the extradition is political in character.

It remains to be considered whether the evidence submitted evinces probable cause to suppose that the specified extraditable offenses or any of them were committed by Shapira.

## III.

### The standard for decision

■ An extradition hearing is not to be equated with a trial of the merits. The actual guilt of the fugitive does not have to be established. The demanding country's evidence need show only such reasonable ground to suppose that the fugitive is guilty as to make it proper that he should be tried.

The issue is confined to the single question of whether the evidence for the state makes a prima facie case of guilt sufficient to make it proper to hold the party for trial. (Charlton v. Kelly, 229 U.S. 447, 461, 33 S.Ct. 945, 949, 57 L.Ed. 1274 (1913)).

The defenses available to the fugitive on an extradition proceeding are sharply limited. For example, alibi evidence and evidence contradicting the demanding country's proof, and evidence in the nature of a defense, such as insanity, are inappropriate to such a hearing. The fugitive's right is limited to adducing evidence which explains rather than contradicts the supporting proof.

## IV.

### The supporting evidence

In support of the 19 Count Statement of Charge evidence was adduced from customers of the two accused following an underlying pattern. As indicated above, persons seeking to invest their money in guaranteed situations, after being put on to one or two bona fide deals with a high interest return augmented by a commission kickback from the accused and accompanied by an institutional guarantee of repayment, were led into transactions in which their money was put up with a company owned by the accused. Higher returns were held out and the guarantee of repayment was that of Otzar Merkazi which the investors were led to believe to be a bank, a bank affiliate or an agency of Hapoel Hamizrachi.

A disinterested reading of the testimony of the complaining witnesses leaves no doubt that prima facie the offenses asserted in the Statement of Charge have been made out and call for a trial of the merits. The accused's counsel vigorously assails the testimony of the witnesses to show that it is not precise, is explainable on other grounds, is not to be credited and is unconvincing. The difficulty with this opposition is that it steps aside from the fair intendment and inferences to be drawn at this stage; this is not a trial nor does the proceeding require a resolution of conflicts or a determination of the merits.

Shapira contends that only four witnesses connect him personally with the offenses, viz., Rosenfeld, Gross, Peretz and Melamed (Counts 9, 12, 16 and 17 respectively). Their testimony does indeed connect him sufficiently and directly to offenses of larceny and forgery and others. This contention overlooks the stark fact that Shapira signed a letter of guarantee delivered to the investors other than the four named and has been charged with conspiracy to commit the felonies recited in the substantive counts relating to investments induced by the accused.

Under New York law the case against Shapira is established prima facie by the permissible inferences for a finding of a conspiracy to commit the crimes even if no single direct act had been brought home by any witness to Shapira.

In People v. Luciano, 277 N.Y. 348, 14 N.E.2d 433 (1938) the Court of Appeals said:

When a conspiracy is shown, or evidence on the subject given sufficient for the jury, then the acts and declarations of the conspirators, in furtherance of its purpose and object, are competent, and in a case like this it is not necessary, in order to make such proof competent, that the conspiracy should be charged in the indictment. (277 N.Y. at 358, 14 N.E.2d at 435, quoting from People v. McKane, 143 N.Y. 455, 470, 38 N.E. 950 (1894)).

The above language has more recently been quoted with approval by the Court of Appeals in People v. Fiore, 12 N.Y.2d 188, 201, 237 N.Y.S.2d 698, 705, 188 N. E.2d 130 (1962) (Burke, J.).

The rule in Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), which is applicable to the conspiracy count, is cited with approval in People v. Cohen, 68 N.Y.S.2d 140, 142 (Kings County Ct.1947) (Sobel, J.), subsequent conviction aff'd, 273 App.Div. 978, 78 N.Y.S.2d 555 (2d Dept. 1948), as "a correct theory of law." *Cohen* proceeded on the theory that a coconspirator carrying out a scheme to defraud is chargeable with all of the acts of the primary defendant or his accom-

plices in furtherance of the common design.

Reference to state law in cases dealing with extradition proceedings for the definition of substantive crimes results from the historical association of criminal prosecution with the states. Long before the criminal provisions of the United States Code reached their present detail, the Supreme Court considered the dependency on state criminal law for international extradition. In Wright v. Henkel, 190 U.S. 40, 58–61, 23 S.Ct. 781, 785–786, 47 L.Ed. 948 (1903), the Court stated:

> As the state of New York was the place where the accused was found and, in legal effect, the asylum to which he had fled, is the language of the treaty, [with Great Britain and Ireland] "made criminal by the laws of both countries," to be interpreted as limiting its scope to acts of Congress, and eliminating the operation of the laws of the states? That view would largely defeat the object of our extradition treaties by ignoring the fact that, for nearly all crimes and misdemeanors, the laws of the states, and not the enactments of Congress, must be looked to for the definition of the offense. There are no commonlaw crimes of the United States; and, indeed, in most of the states the criminal law has been recast in statutes, the common law being resorted to in aid of definition . . .

In July, 1844, Attorney General Nelson advised the Secretary of State, then Mr. Calhoun, that "cases, as they occur, necessarily depend upon the laws of the several states in which the fugitive may be arrested or found" . . .

So, Mr. Secretary Fish, in November, 1873, in replying to certain specified questions of the minister of the Netherlands, among other things, said: . . . "that the criminal code of the United States applies only to offenses defined by the general government, or committed within its exclusive jurisdiction, or upon the high seas, or some navigable water, and that each state establishes and regulates its own criminal procedure, as well with respect to the definition of crimes as to the mode of procedure against criminals, and the manner and extent of punishment." . . .

> [W]e rule it now . . . that when, by the law of Great Britain, and by the law of the state in which the fugitive is found, the fraudulent acts charged to have been committed are made criminal, the case comes fairly within the treaty, which otherwise would manifestly be inadequate to accomplish its purpose. And we cannot doubt that, if the United States were seeking to have a person indicted for this same offense under the laws of New York extradited from Great Britain, the tribunals of Great Britain would not decline to find the offense charged to be within the treaty because the law violated was a statute of one of the states, and not an act of Congress.

Some years later the Supreme Court discussed the procedure to be followed should the laws of the particular forum state, to which the federal court looks for definitions of criminal offenses, not treat the acts cited as criminal: In Factor v. Laubenheimer, 290 U.S. 276, 300, 54 S.Ct. 191, 198, 78 L.Ed. 315 (1933), the Court stated:

> Once the contracting parties are satisfied that an identified offense is generally recognized as criminal in both countries there is no occasion for stipulating that extradition shall fail merely because the fugitive may succeed in finding, in the country of refuge, some state, territory or district in which the offense charged is not punishable. No reason is suggested or apparent why the solemn and unconditional engagement to surrender a fugitive charged with the named offense of which petitioner is accused

should admit of any inquiry as to the criminal quality of the act charged at the place of asylum beyond that necessary to make certain that the offense charged is one named in the treaty.

■ Therefore, while state law provides primary initial guidance in an· extradition proceeding, unique provisions of the forum state's law which might unduly hamper the extradition treaty should require only a qualified obeisance to that state law. *Cf.* Application of D'Amico, 185 F.Supp. 925, 930–931 n. 6 (S.D.N.Y.1960), appeal dismissed, United States ex rel. D'Amico v. Bishopp, 286 F.2d 320 (2d Cir. 1961).

■ Shapira further contends that the government's proof fails to satisfy the Treaty standard, Article V thereof, which requires that the evidence be found sufficient, according to the laws of the place where the fugitive shall be found, to justify his committal for trial. He then points to a recent amendment to the New York CPL § 180.60(8) which mandates that at a hearing on a felony complaint, "only non-hearsay evidence is admissible to demonstrate reasonable cause to believe that the defendant committed a felony." And, argues Shapira, the government's evidence ·was introduced by documents and is thus all hearsay.

That argument, although ingenious, is thoroughly misconceived.

The evidence produced by the United States on behalf of Israel satisfied the treaty requirement because it was taken in Israel in a manner acceptable under New York's standards. NYCPL § 180.-60. The evidence given in Israel was of a non-hearsay character and demonstrates reasonable cause to suppose that the respondent committed the felonies charged.

■ The respondent contends that the government was required to present the necessary evidence in this country in the manner in which a hearing on a felony complaint must be conducted in a New York court. This is error. The reference in the treaty to the sufficiency of the evidence is a reference at most when applied to subd. 8 of NYCPL § 180.60 to the criteria established by state law which the Israeli proceedings must satisfy; the treaty does not prescribe the place where the necessary evidence is to be taken; "the evidence" presented to this Court pursuant to 18 U.S.C. § 3190 was properly presented in a form in which it could properly be admitted as evidence on an extradition hearing. It would introduce chaos into extradition proceedings to construe the treaty so as to require the personal appearance of the complaining witnesses in the state of asylum. If the respondent's argument were to be credited, it would as a practical matter be a means to frustrate criminal prosecution abroad for offenses committed there. No such perverse construction makes sense. Nor would it conform to the stated object of the treaty which was the desire "to make effective the cooperation of the two countries in the repression of crime."

Clearly in framing the treaty the United States government was unwilling to commit any State to the proposition that the kind of evidence acceptable in a demanding country to invoke a request for extradition might be any kind acceptable to the foreign country. To the contrary the requirement of the treaty is that a State's own evidentiary standards must ground the foreign proceedings in order to be recognized as sufficient for an extradition response. That protection would avoid demands based on notions of evidence inconsistent with a State's due process standards.

The Israeli procedure conformed with the due process standards that would be applied in New York,[2] and this compli-

---

2. The flight of respondent from Israel after his arrest waived the requirements which presume his presence there.

ance was appropriately proved to this Court by the evidence adduced before it, 18 U.S.C. § 3190, and it is so found. As stated above this finding requires that the instant demand for extradition be honored.

Many other points are suggested by the voluminous papers and motions filed in opposition on this proceeding. Suffice it to say they are self-evidently lacking in merit and seemingly do not require extended discussion.

In conclusion, Shmuel Shapira, named herein as Samuel Shapiro, is the fugitive sought by the State of Israel. This Court has jurisdiction in this proceeding. The offenses included in the Israeli charges against Shapira are within the treaty. There is reasonable ground in the evidence to suppose that such offenses were committed and that Shapira committed them and that the courts of this country and of New York would find prima facie evidence of guilt on this record.

The foregoing shall constitute the findings of fact and conclusions of law herein and the motions of the respondent are disposed of accordingly.

Pursuant to Title 18, United States Code, Section 3184, it is

Ordered, that this Certification and Order, together with a copy of all testimony heard and evidence submitted at the hearing herein on December 21 and December 22, 1972, be forwarded by the Clerk of this Court to the Secretary of State so that a warrant may issue upon the requisition of the proper authorities of the State of Israel for the surrender of the respondent Shmuel Shapira; and it is further

Ordered, that the bail of the respondent Shmuel Shapira be revoked and that he be committed forthwith to the custody of the United States Marshal for the Southern District of New York to await surrender pursuant to such warrant. This ordering paragraph is stayed for 10 days from the date hereof.

So ordered.