# Supplementary Discussion of the President's Powers Relating to the Seizure of the American Embassy in Iran

Under the Vienna Convention on Diplomatic Relations, diplomats are not subject to any form of arrest or detention even in case of armed conflict, though their movements may be restricted. Iran's conduct might be invoked in this case as a ground for suspending the Convention, in which case non-forcible reprisals against its diplomats in this country may be used.

The President may use his constitutional power to protect Americans abroad, subject to the consultation and reporting requirements of the War Powers Resolution. While not unconstitutional on their face, these requirements may have applications which raise constitutional questions insofar as they limit the President's power as Commander-in-Chief.

The International Emergency Economic Powers Act and the National Emergencies Act together authorize the blocking of Iranian assets and the subsequent licensing of particular transactions. These statutes specify the procedures to be followed in the event such a course is followed.

November 11, 1979

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

In response to your request we are providing additional details on some of the matters discussed in our memorandum of November 7, 1979.

### I. Treatment of Iranian Diplomats in the United States

The Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, ratified by Iran, the United States and all major countries of the world, codifies the law in this area. It is assumed to be self-executing and thus part of domestic law as well.[1] Article 29 provides that a diplomat shall not be liable to any form of arrest or detention. Immunity continues even in case of armed conflict (Art. 39.2). The United States vigorously opposed the latter provision at the time of drafting, stating that it was unrealistic and did not represent universal practice. The delegation pointed out that almost

---

[1] *See, e.g.,* Letter from Assistant Attorney General Dixon to the Acting Legal Adviser, May 4, 1973, in the 1973 Digest of United States Practice in Int'l L. 143, 144. The enactment of the Diplomatic Relations Act, P.L. 95-393, 22 U.S.C. § 254a *et seq.* (Supp. II 1978), does not affect this conclusion. The Act does not purport to apply to stituations covered by the Convention but complements the Convention by prescribing rules for non-parties and for matters not covered explicity in the Convention, such as liability insurance.

every government involved in World War II placed restrictions of some kind on the movement of enemy diplomats and the withdrawal of their property. The United States proposed an amendment which might well have applied here. It would have authorized the host state in time of national emergency, civil strife, or armed conflict to institute appropriate measures of control with respect to mission funds and persons enjoying privileges and immunities and their property, including protective custody to insure their safety. It was defeated, however, by a vote of 38 to 6 with 26 abstentions. 7 M. Whiteman, *Digest of Int'l Law* 441.

Despite this record there are a number of approaches which can be used to mitigate the prohibition mentioned.

## A. Protective Custody

Article 26 makes freedom of travel subject to "laws and regulations concerning zones entry into which is prohibited or regulated for reasons of national security." The domestic legislative history of the Convention shows that "protective custody" could be justified under this provision. The State Department Legal Adviser testified before the Senate Foreign Relations Committee that this provision could be used in situations involving armed conflict to justify placing diplomats in protective custody. He pointed out that while Article 29 prohibits arrest, it also provides that the host state shall take appropriate steps to prevent attacks on a diplomat's person, freedom, and dignity. 7 M. Whiteman, *supra* at 442. Article 26 is not limited to times of armed conflict. It is, in fact, used on an ongoing basis to restrict travel of foreign diplomats particularly where their countries impose restrictions on United States diplomats. Despite the reference to "laws and regulations" in Article 26, the State Department informs us that there is no special procedure for imposing such restrictions. The appropriate embassy is merely informed of the restrictions.

The protective custody approach has one distinct advantage in that it may not technically constitute an arrest and authority can be gleaned from the text and domestic legislative history of the Convention. As we show below, it may be that we are no longer bound by the inhibition of Article 29 against arrest. This would, however, merely eliminate the prohibition; it would not, in itself, provide a valid ground under domestic law for arrest which presumably could then be challenged for illegality as any other arrest may be.

## B. Reciprocity

Article 47.2(a) permits us to apply any of the provisions of the Convention restrictively because of a restrictive application of a provision to our embassy in Iran. It may, of course, be something of a misnomer to describe the conduct of the occupiers of the American embassy as a "restrictive" application. Since that government appears,

124

however, to have adopted this conduct as its own, we would appear justified in similarly restricting the movement of Iranian diplomats.

The Diplomatic Relations Act, *supra* note 1, reinforces the use of Art. 47 by similarly providing for restriction of immunity:

> The President may, on the basis of reciprocity and under such terms and conditions as he may determine, specify privileges and immunities for members of the mission, their families, and the diplomatic couriers of any sending state which result in more favorable treatment or less favorable treatment than is provided under the Vienna Convention.

22 U.S.C. § 254c. The legislative history shows that this was intended to be used as a tool to respond to arbitrary treatment of American diplomats:

> The conditions under which U.S. diplomatic personnel carry out their official functions and lead their lives in certain hardship areas dictate their enjoyment of increased protection from harassment as a result of arbitrary application of local law. This provision permits less favorable treatment than the Vienna Convention and covers those cases where certain nations restrict the privileges and immunities of U.S. diplomatic personnel abroad. Any use of the discretion described in this section must be on a reciprocal basis with the nations involved.

S. Rep. No. 958, 95th Cong. 2d Sess. 5 (1978).

## C. Suspension of Convention for Breach

The discussion above has proceeded on the assumption that the Convention is still in force. There has, however, been a material breach on the part of the Iranians' treaty obligation to protect our embassy and diplomats. In such a case, the United States may invoke the Iranian conduct as a ground for suspending the operation of the Convention in whole or in part as far as the Iranians are concerned. Vienna Convention on the Law of Treaties, Art. 60, Senate Exec. L., 92d Cong., 1st Sess. (1971).[2] In such a case we can consider ourselves not bound by the provisions pertinent to the situation at hand, such as immunity from detention or arrest, or from the whole Convention, should the President choose. As noted earlier, however, this would not by itself provide a valid legal basis for arrest but merely remove immunity from arrest. Although the Convention provides for the right to leave the country,

---

[2] This treaty is not yet in force and has not been ratified by the United States. It is, however, generally cited as evidencing contemporary practice in this field. *Cf. Charlton* v. *Kelly.* 229 U.S. 447, 473 (1913).

this could be suspended as well, particularly since Americans are being denied that right in Iran.

### D. Reprisals for Breach

International law recognizes that, beyond suspending the effect of the treaty, "non-forcible" reprisals may be used in the case of breach. *Commentary on Vienna Convention on Law of Treaties,* [1966] 2 Y. B. Int'l L. Comm'n 169, 253–54, U.N. Doc. A/CN.4/SER.A/1966/Add.1.[3] These reprisals may properly relate to the rights of the Iranians under the Convention. *Ibid.*

In evaluating possible reprisals, it is useful in a modern sense to think of them as a method of communication:

> Reprisals are usually employed when words alone cannot influence the other party's decision and make it discontinue what it is doing. They are subordinated to particular objectives and are used in limited selective, exemplified, and incrementary ways. Reprisals should be distinguished from mere acts of vengeance or of destroying the opponent's capabilities. Rather, they are part of a political-diplomatic strategy for resolving and reconciling conflicting interests. As such, communicative signals are built into them. The success of a reprisal may be judged by whether it exerts the desired influence on the target, whether it stands by itself or is part of a credible threat to expand the conflict further, if necessary. An effective reprisal, therefore, while seeking to narrow some of the adversary's alternatives, should keep other alternatives open. This may be best achieved when retaliatory acts are understood to form part of a comprehensive strategy that combines negative sanctions with positive inducements.

David, The Strategy of Treaty Termination: Lawful Breaches and Retaliations 234 (Yale Univ. Press, 1975).

At the present time we are not aware of specific facts which, under United States law, would justify arrest of individual Iranian diplomats even if there were no bar to their arrest under international law for the reasons specified. If they could be shown to be part of a conspiracy (18 U.S.C. § 371) to damage government property (18 U.S.C. § 1361) there may be a basis. The Neutrality Act and other statutes involving crimes against foreign governments or foreign property are generally directed to the protection of foreign states. 18 U.S.C. § 951 *et seq.*

---

[3] The term "non-forcible" would appear to mean not involving the use of armed force as prohibited by Art. 2.4 of the U.N. Charter rather than merely placing someone under arrest. The law of reprisal of an earlier period was not so restricted. 2 Oppenheim's Int'l Law 114 (Lauterpacht ed. 1935); 7 Moore. Int'l Law Digest 119 (1906). This does not, of course. limit the President's right to use force to directly free the hostages.

126

## II. Use of Armed Forces Abroad

As we noted, the President may use his constitutional power to protect Americans abroad subject to the consultation and reporting provisions of the War Powers Resolution. 50 U.S.C. § 1541 *et seq.*

### A. Consultation Requirement

The consultation requirement focuses on the use of troops in hostile situations:

> The President in every possible instance shall consult with Congress before introducing United States Armed Forces into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, and after every such introduction shall consult regularly with the Congress until United States Armed Forces are no longer engaged in hostilities or have been removed from such situations.

50 U.S.C. § 1542.

(1) On its face consultation is required with "Congress." This language replaced an earlier version which merely required consultation with the leadership and appropriate committees of Congress. H. Conf. Rep. No. 547, 93d Cong. 1st Sess. 8 (1973); H. Rep. No. 287, 93d Cong. 1st Sess. 6 (1973). Nevertheless, as a practical matter consultation with any more than a select group of congressional leaders has never been attempted. During the *Mayaguez* incident, about ten House and eleven Senate members were contacted concerning the measures to be taken by the President. On the House side these included the Speaker, the majority and minority leaders, and the chairman and ranking minority members of the House Committee on International Relations. Testimony of State Department Legal Adviser Monroe Leigh in *War Powers: A Test of Compliance Relative to the Danang Sealift, the Evacuation of Phnom Penh, the Evacuation of Saigon, and the Mayaguez Incident, Hearings before the Subcommittee on Int'l Security and Scientific Affairs of the House Comm. on Int'l Relations,* 94th Cong. 1st Sess. 78 (1975) (hereafter *War Powers: A Test of Compliance*). The present Administration has acknowledged that there are practical limits to the consultation requirement and has said that meaningful consultations with "an appropriate group of congressional representatives should be possible." Statement of State Department Legal Adviser Hansell before the Senate Foreign Relations Committee reprinted in State Department Bulletin, August 29, 1977 at 291, 292.

(2) A determination must also be made as to when hostilities exist that require consultation. President Ford took the position, for example, that no consultation was legally required at the Danang or Lebanon evacuations because hostilities were not involved. Franck, *After the*

127

*Fall: The New Procedural Framework for Congressional Control Over the War Power,* 71 Am. J. Int'l L. 605, 615 (1977) (hereafter Franck). The State and Defense Departments have said that "hostilities" means a situation in which American forces are actively exchanging fire with opposing units and "imminent hostilities" means a situation where there is a serious risk from hostile fire to the safety of U.S. forces. Neither term was thought to encompass irregular or infrequent violence which may occur in a particular area. *War Powers: A Test of Compliance* at 38–39.

(3) In requiring consultation in "every possible instance," Congress meant to be firm yet flexible. H. Rep. No. 287, *supra,* at 6.

> The use of the word "every" reflects the committee's belief that such consultation *prior* to the commitment of armed forces should be inclusive. In other words, it should apply in extraordinary and emergency circumstances—even when it is not possible to get formal congressional approval in the form of a declaration of war or other specific authorization.
>
> At the same time, through use of the word "possible" it recognizes that a situation may be so dire, e.g., hostile missile attack underway, and require such instantaneous action that no prior consultation will be possible.

*Id.* (Emphasis in original.)

This Administration has pointed out the problem that exists in emergencies, noting that "[B]y their very nature some emergencies may preclude opportunity for legislative debate prior to involvement of the armed forces in hostile or potentially hostile situations." It has recognized, however, that consultation may be had "in the great majority of cases." Statement of Legal Adviser Hansell, *supra.*

(4) There may be constitutional considerations involved in the consultation requirement. When President Nixon vetoed the Resolution he did not suggest that either the reporting or consultation requirements were unconstitutional. Department of State Bulletin, November 26, 1973, at 662–64. Neither the Ford nor Carter administrations have taken the position that these requirements are unconstitutional on their face.[4] Nevertheless, there may be applications which raise constitutional questions. This view was stated succinctly by State Department Legal Adviser Leigh:

> Section 3 of the War Powers Resolution has, in my view, been drafted so as not to hamper the President's exercise of his constitutional authority. Thus, Section 3 leaves it to the President to determine precisely how

---

[4] The only provision that this Administration has suggested presents constitutional problems related to the right of Congress to act by concurrent resolution. *See* 123 Cong. Rec. 21,897 (1977).

consultation is to be carried out. In so doing the President may, I am sure, take into account the effect various possible modes of consultation may have upon the risk of a breach in security. Whether he could on security grounds alone dispense entirely with "consultation" when exercising an independent constitutional power, presents a question of constitutional and legislative interpretation to which there is no easy answer. In my personal view, the resolution contemplates at least some consultation in every case irrespective of security considerations unless the President determines that such consultation is inconsistent with his constitutional obligation. In the latter event the President's decision could not as a practical matter be challenged but he would have to be prepared to accept the political consequences of such action, which might be heavy.

*War Powers: A Test of Compliance* at 100.

## B. Reporting Requirements

The reporting requirements apply to situations not only where hostilities are taking place or imminent (which requires consultation), but where armed forces are sent to a foreign country equipped for combat. 50 U.S.C. § 1543. The report must be filed within 48 hours. This has been interpreted as meaning 48 hours from the time that they are "introduced" into the situation triggering the requirement and not from the time that the decision to dispatch them is made. *E.g.,* Franck at 615. The report must include:

> (A) the circumstances necessitating the introduction of United States Armed Forces;
> (B) the constitutional and legislative authority under which such introduction took place; and
> (C) the estimated scope and duration of the hostilities or involvement.

Reports which have been filed in the past have been brief and to the point; they have not run more than one or two pages. The reference to legal authority has been one sentence, referring to the constitutional power as Commander-in-Chief and Chief Executive. *See War Powers: A Test of Compliance* at 75 *(Mayaguez); The War Powers Resolution, Relevant Documents, Correspondence, Reports,* Subcomm. on Int'l Security and Scientific Affairs, House Comm. on Int'l Relations, 94th Cong., 1st Sess. 40 (Danang); 42 (Phnom Penh) (Comm. Print 1975).

129

## III. Blocking Assets of Iranians

The President may direct the Treasury Department to block assets of Iranians and to subsequently license particular transactions as desired. This power is provided by the International Emergency Economic Powers Act (the Act), P.L. 95-223, 91 Stat. 1626, 50 U.S.C. § 1701 *et seq.* (Supp. I 1977), in tandem with the National Emergencies Act, 50 U.S.C. § 1601. Neither Act has been invoked before, although there are well-established precedents for employing such controls under similar prior authority. *E.g., Sardino* v. *Federal Reserve Bank,* 361 F.2d 106 (2d Cir.), *cert. denied,* 385 U.S. 898 (1966) (blocking Cuban assets). *See generally* 42 Op. Att'y Gen. 363 (1968).

If this course is to be followed, the following steps must be taken immediately:

(1) *Consultation with Congress:* The consultation requirement tracks that found in the War Powers Resolution (discussed in Part II, *supra*) and presumably can be interpreted in much the same way. 50 U.S.C. § 1703. Security is, of course, necessary since advance warning will assist persons potentially affected in evading controls by withdrawing assets from banks or removing currency from the country. Unlike the situation involving the War Powers Resolution, the President cannot argue here that he is exercising a constitutional power and thus avoid statutory restrictions.

(2) *Declaration of a National Emergency:* A proclamation of national emergency is necessary to use the powers available under the Act. 50 U.S.C. § 1701. The President is authorized to declare one pursuant to the National Emergencies Act. 50 U.S.C. § 1621. For purposes of the Act such an emergency may be declared with respect to any unusual and extraordinary threat to the national security, foreign policy, or economy of the United States which has its source outside this country. 50 U.S.C. § 1701. This language was left broad to provide necessary discretion. H. Rep. No. 459, 95th Cong., 1st Sess. 10 (1977). We believe that the present emergency meets the language of the statute.

A declaration can be short and to the point. The President in this case could state: "I find that the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and hereby declare a national emergency."[5] The courts will not review a determination so peculiarly within the province of the President. *See* 42 Op. Att'y Gen. at 370.

(3) *Designation of Act:* In the same proclamation or by contemporaneous or subsequent executive orders, the President must designate the particular emergency statute he wishes to invoke—The International

---

[5] *See* Proc. 4074, 7 Weekly Comp. Pres. Doc. 1174 (August 15, 1971) ("I hereby declare a national emergency during which I call upon the public and private sector to make the efforts necessary to strengthen the international economic position of the United States").

130

Emergency Economic Powers Act. This is a requirement of the National Emergencies Act. 50 U.S.C. § 1631. We see no reason why this should not be done in the same document that declares a national emergency.

(4) *Delegation:* Since the statute vests powers directly in the President, any order should delegate power to an appropriate official. 3 U.S.C. § 301. Presumably this would be the Secretary of the Treasury who already administers similar programs. The President could in the order (a) declare an immediate freeze by prohibiting the transactions listed in the Act including transactions in foreign exchange, transfers of credit and payments between banking institutions, and importing and exporting of currency in which any Iranian has an interest and (b) delegate to an appropriate official the powers to make exceptions and to administer the freeze and enforce the Act. *Compare* Exec. Order No. 11387, "Governing Certain Capital Transfers Abroad," 33 Fed. Reg. 47 (1968). This would avoid any enforcement gap between the issuance of the Proclamation and implementation of the regulations by Treasury.[6]

(5) *Publication and Transmittal to Congress:* The National Emergencies Act requires that the emergency proclamation be immediately transmitted to Congress and published in the Federal Register. 50 U.S.C. § 1621.

(6) *Report to Congress:* Following the issuance of the order, the President shall "immediately" transmit a report to the Congress specifying:

> (a) the circumstances which necessitate such exercise of authority;
>
> (b) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;
>
> (c) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;
>
> (d) why the President believes such actions are necessary to deal with those circumstances; and
>
> (e) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

---

[6] We have been shown a proposal which is limited to freezing funds of Iranian students, which contemplates an effective date one week from issuance of the executive order. This would not seem to accomplish its purpose since it would enable students to draw funds from banking institutions in anticipation of the ban. Moreover, it is not clear whether the banks could effectively administer an initial freeze limited to students since they may not have records to show just which Iranian accounts belong to students. It should be noted, however, that if the students were to withdraw funds from the banks following the effective date, they would be committing a federal crime in doing so. 50 U.S.C. § 1705.

50 U.S.C. § 1703(b).

The legislative history indicates that this requirement was not to impede use of emergency power. The House report notes:

> Nothing in this section should be construed as requiring submission of a report as a precondition of taking action where circumstances require prompt action prior to or simultaneously with submission of a report.

H. Rep. No. 459, *supra* at 16. This provision is modeled on the War Powers Resolution. As indicated in Part II above, the practice under that resolution is to file very brief reports.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*