**UNITED STATES of America,**
**Plaintiff/Appellee,**

v.

**Jose Maria SINDIN,**
**Defendant/Appellant.**

**No. 79–5519**
**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

June 26, 1980.

* Fed.R.App.P. 34(a); 5th Cir.R. 18.

Oscar S. Rodriguez, Coral Gables, Fla. (court-appointed), for defendant/appellant.

A. Scott Miller, Asst. U. S. Atty., Miami, Fla., for plaintiff/appellee.

Before CHARLES CLARK, VANCE and SAM D. JOHNSON, Circuit Judges.

PER CURIAM:

On April 20, 1979, defendant Jose Maria Sindin, a Colombian sailor, was convicted after jury trial on a two count indictment that charged him with knowingly and intentionally importing cocaine into the United States and possessing that narcotic with the intent to distribute it in violation of 21 U.S.C.A. §§ 841(a)(1) and 952(a). The gross weight of the cocaine in issue was approximately 1,400 grams. Since Sindin could not speak English, an interpreter at trial translated all questions from English to Spanish and all answers from Spanish to English. After the return of the jury's verdict of guilty, the district judge sentenced Sindin on each offense to separate, concurrent four year terms of imprisonment. He also ordered Sindin to serve separate special parole terms of five years for each offense on his release from prison. The special parole terms are to be completed concurrently.

On this appeal, Sindin argues that the district court lacked subject matter jurisdiction and that the government presented insufficient evidence of an intent to distribute cocaine within the United States. Since we conclude that the facts of this case support both the trial court's finding of subject matter jurisdiction and the jury's verdict on both counts, we affirm.

Defendant Sindin was arrested on February 25, 1979 while going through customs at the Miami International Airport in Dade County, Florida. His arrest took place shortly after Aerocondor Flight 192 arrived early that morning from Barranquilla, Colombia. Defense counsel at trial stipulated that Sindin was on Flight 192.

The previous evening, that is, on February 24, 1979, a United States customs inspector had noticed two scuba tanks alongside some unclaimed luggage. The two scuba tanks and an accompanying suitcase were all marked with consecutively numbered tags for Aerocondor Flight 192. The customs inspector noticed that the scuba tanks had no valves, such as tanks usually have. On closer examination, the customs inspector tapped them only to discover that they sounded solid.

These circumstances aroused the suspicion of the airport customs officials and the tanks were moved from the luggage area for inspection. A small hole was drilled in one of the two scuba tanks. When the drill was removed from the hole in the tank, the customs inspectors noticed a white substance on the drill bit. They then conducted a field test of that substance. The results of the field test indicated that the substance was cocaine. At that point, the customs officials sawed the tank completely in two. Inside the tank were a number of individual packages of cocaine. Upon that discovery, the customs officials called in agents from the Drug Enforcement Administration. The DEA agents arrived and examined the contents of the open tank. After their examination, the scuba tank was reconstructed, and both scuba tanks were then returned to their original location so that they might be claimed. Two DEA agents established surveillance over the scuba tanks in the customs enclosure area.

The next morning, after the arrival of Aerocondor Flight 192, Sindin was observed entering the customs enclosure where he picked up the two scuba tanks and the accompanying suitcase. He was one of the last persons to come out of the immigration area and proceed to customs. After picking up the tanks, Sindin carried them and the suitcase toward the customs examination checkpoint. As Sindin was engaged in this undertaking, the reconstructed tank fell apart. When this occurred, the tank opened sufficiently to expose the packets of cocaine. Sindin bent down, put the tank back together, and continued to the checkpoint where he placed the tanks on the customs examination belt. At the checkpoint, Sindin presented the scuba tanks and his luggage for inspection. He had in his possession the corresponding baggage claim receipts, which were affixed to his airplane tickets.

A customs official at the checkpoint checked Sindin's customs declaration card and asked Sindin if he had anything to declare before passing through customs. Sindin had not declared anything on the card, and he orally told the customs official that he had only coffee to declare. Sindin was then taken to the DEA office and placed under arrest. Subsequent searches by customs officials and DEA agents revealed that both scuba tanks contained cocaine and that the suitcase contained a wet suit, fins and valves that would go on top of the tanks.

On the occasion in question Sindin was traveling with a Spanish passport that he presented to the customs officials at the Miami airport. He did not have a visa or permit to enter the United States, but he did have customs declaration and immigration cards that he handed to the officials. Both cards stated that Sindin was in transit. Sindin's flight ticket did not indicate a planned airflight within this country. The flight ticket that Sindin possessed listed instead an itinerary from Colombia to Miami, from Miami to Nassau, and from Nassau to Luxembourg.

Sindin's flight tickets were originally issued on September 15, 1978, over five months prior to his arrest on February 25, 1979. The portion of the ticket scheduling Sindin's flight from Miami to Nassau indicated he had an "open" flight, that is, a flight without any scheduled departure date. The open flight from Miami to Nassau had been arranged sometime after the tickets were originally issued in 1978. The portion of the ticket scheduling Sindin's flight from Nassau to Luxembourg was for a fixed date, February 24, 1979. Since Flight 192 arrived as scheduled in Miami at approximately 12:50 a. m. on February 25, 1979, its arrival time in Miami that day would have prevented any passenger on Flight 192 from catching the Nassau flight to Luxembourg.

At trial, Sindin took the stand and denied that he had any plans to stop in this country other than to make necessary scheduled plane changes in Miami. He explained that he had no intent to leave the scuba tanks in the United States and that his flight was scheduled through this country for reasons of economy. Sindin testified that he was to receive $5,000 to transport the two tanks to France, but that he did not know that the tanks contained cocaine.[1]

---

1. Sindin testified that he met an individual, who called himself "Marcel", sometime in mid 1978 in Santa Marta, off the coast of Colombia. Sindin testified that Marcel had said he was from France and that he would pay Sindin $5,000 to deliver the scuba tanks to him in Bordeaux, France. Sindin explained that he accepted the offer because he needed approximately $3,000 to pay inheritance taxes.

Sindin testified that he later tried to withdraw from his agreement to transport the scuba tanks, but that Marcel told him that he had a commitment to deliver the tanks and that if he failed to carry it out, his family would pay for that failure. Additionally, Sindin testified that Marcel had warned him that someone would watch him throughout his trip. Sindin testified that he met four people at the airport in Colombia who had the same flight itinerary as his, and that he thought those four people were watching him for Marcel.

Sindin also testified that he was afraid for himself and his family. Sindin's testimony concerning his fear was corroborated in part by prosecution witnesses. Government witnesses testified that they questioned two passengers

■ Sindin argues on appeal that the trial court lacked subject matter jurisdiction because he was a purely international in transit passenger. This contention is overruled. Sindin was within the territorial limits of the United States at the time of his visit even though he had not left the custody of the customs area. See *Pineda v. United States*, 393 F.2d 139 (5th Cir.), *cert. denied*, 392 U.S. 943, 88 S.Ct. 2327, 20 L.Ed.2d 1405 (1968). Clearly, Sindin could have scheduled an international flight from the point of his departure to his apparent ultimate destination that did not stop in the United States.

■ This Court also disagrees with Sindin's second contention that the government presented insufficient evidence of an intent to distribute the cocaine within the United States. For purposes of this appeal, we assume but do not hold that 28 U.S.C.A. § 841(a)(1) requires proof of an intent to distribute narcotics within this country. The government presented sufficient evidence, although partially circumstantial to show that the defendant entered into the United States from abroad and that he had knowingly imported into this country an ample amount of an illegal drug. *United States v. Catano*, 553 F.2d 497, 500 (5th Cir.) *cert. denied*, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977); *United States v. Pentapati*, 484 F.2d 450, 451 (5th Cir. 1973). The government did not have to prove that Sindin was actually seen carrying the drug over the border. *United States v. Miranda*, 593 F.2d 590, 596 (5th Cir. 1979).

In support of his second contention, Sindin refers to the fact that at the time of his arrest he carried immigration and customs declaration cards marked in transit, and that he did not have in his possession an airline ticket to any city located further inside the United States than Miami. These factors are by no means dispositive,

and the jury had the right to weigh and evaluate all the documentary evidence and accompanying testimony. The jury appears to have chosen to discount these two factors and rely instead upon the remaining evidence and the reasonable inferences drawn therefrom.

The uncontradicted testimony by customs officials and DEA agents that were on duty the morning of February 25, 1979 revealed that Sindin was arrested while going through customs carrying the two tanks containing cocaine and that he had knowingly decided to fly from Colombia and land in this country.[2] It is clear from this evidence and the other testimony presented at trial that the jury could have concluded Sindin was knowingly carrying cocaine into this country. One of the DEA agents testified that he had found a notebook inside of Sindin's hand luggage. The government's expert chemist then told the jury that this notebook contained a formula in Spanish for what appeared to him to be a procedure for dechlorilyzing and purifying cocaine. The only response to this testimony was from Sindin who stated that Marcel had given him the chemical formula. This is sufficient evidence, albeit circumstantial, of Sindin's intent to import cocaine into this country.

It is also apparent that the jury could have concluded that Sindin had an intent to distribute the cocaine within the United States. Sindin told the jury that the notebook found inside his hand luggage contained a local Miami address in addition to the formula for purifying cocaine. He testified that he or Marcel had booked his flight to Miami and that he had an open ticket for a flight to Nassau. The obvious result is that Sindin was not scheduled for departure from this country. Moreover, the remaining portion of Sindin's flight itiner-

from Flight 192 other than Sindin on February 25, 1979 who had the same itinerary as Sindin for travel between Colombia and Luxembourg. Other government testimony revealed that Sindin, upon being questioned after his arrest, had told a customs inspector that he might as well be dead.

2. The government's expert witness at trial testified to the fact that the substance in question was cocaine. Sindin's attorney stipulated to the chain of custody of the substance from after the date of his arrest through its testing at the regional DEA laboratory.

ary (from Nassau to Luxembourg for February 24, 1979) was a schedule which could not possibly be met because of his arrival time in Miami on February 25, 1979. As a result of these travel arrangements, Sindin was in a position to remain in this country. See *United States v. Pentapati*, supra, 484 F.2d at 451 n. 1 (defendant's possession of an airline ticket to an interior American city indicated a sojourn of some duration in this country). Sindin's flight arrangements, his possession of a local Miami address, his possession of a formula for purifying cocaine, and his attempt to clear customs with two scuba tanks containing cocaine all support the jury's conclusion that he intended to distribute cocaine in this country.

Sindin's credibility was an issue before the jurors, and they were free to evaluate his statements that he was in transit and that he had no intention of leaving the scuba tanks in this country. The jury apparently chose to discount Sindin's testimony, which they were not only entitled to do, but also which they might have been expected to do in light of the other serious discrepancies in his testimony. For example, Sindin told the jury that he did not know that the tanks contained cocaine even after other witnesses had testified about the breaking in two of one of the tanks clearly exposing the cocaine to view. Further, a DEA agent testified that Sindin had told him conflicting stories on whether he was traveling with another passenger; and that other passenger was observed paying particular interest to the scuba tanks and was one of those who had the same flight itinerary as Sindin. Sindin had a business card of that other passenger on his person at the time of his arrest. The contradictory nature of Sindin's testimony taken together with the other evidence presented at trial supports the jury's decision that Sindin was guilty on both counts.

The jury was authorized to weigh all the evidence and the credibility of the testimony of the witnesses, including Sindin's. Even assuming that 21 U.S.C.A. § 841(a)(1)

requires proof of an intent to distribute within the United States, the record contains sufficient evidence to warrant the jury's verdict of guilty. Both convictions are affirmed.

AFFIRMED.