**UNITED STATES of America**

v.

**Kenneth Charles FELD, Albert Blaine Foreman, Michael Jay Muench, and Michelle Annette Lewis, Defendants.**

**No. 81 CR 4(S).**

United States District Court, E. D. New York.

May 6, 1981.

---

Edward R. Korman, Esq. U. S. Atty., E. D. New York, by Winstanley F. Luke, Esq. Asst. U. S. Atty., Brooklyn, N.Y., for plaintiff.

Richard N. Potack, East Palo Alto, Cal., for defendant Feld.

C. Vernon Mason, New York City, for defendant Foreman.

Cameron Cunningham, East Palo Alto, Cal., for defendant Muench.

William M. Kunstler, New York City, for defendant Lewis.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Indictment 81 CR 4(S) charges defendants in four counts with violations of federal narcotics laws arising out of the seizure of over 17 pounds of cocaine at John F. Kennedy International Airport on December 10, 1980. Count 1 charges defendants with conspiring with Miciala Evans (who is now deceased)· to violate 21 U.S.C. § 841(a)(1) and alleges that as part of the conspiracy defendants "would import into the United States from places outside," and would distribute, cocaine. Count 2 charges defendants Foreman, Muench and Lewis with possession of cocaine at Kennedy Airport with intent to distribute. In count 3 defendants Foreman, Muench and Lewis are charged with importation of cocaine into the United States from Bolivia, South America. Count 4 charges that these three defendants brought and possessed cocaine on board an aircraft, in violation of 21 U.S.C. § 955.

Claiming that they "cannot be prosecuted for any crime or crimes alleged in the indictment to have taken place in this or any other federal district,"[1] defendants have moved to dismiss the indictment. The Court previously denied the motion orally and now supplements its decision with the following memorandum.

These facts appear from the stipulations of counsel and the testimony adduced at a hearing on defendants' motion to suppress evidence:

In November 1980, agents of the Drug Enforcement Administration ("DEA") in San Francisco, California, received information from an anonymous caller that defendant Feld and four others were planning to smuggle a substantial quantity of cocaine from South America to Germany via Kennedy Airport in New York. On December 3, 1980, the same source informed the DEA that Feld had that day flown to La Paz, Bolivia, where he would purchase approximately 20 pounds of cocaine. The informant also said that defendants Lewis and Foreman would fly to La Paz to meet Feld and receive luggage in which the cocaine would be concealed. The suitcases would bear baggage identification tags in the names of "Micky" and "Michael", the last names being unknown to the informant.

According to the informant, Lewis and Foreman would fly from La Paz to Munich, Germany, with a stopover in New York. At New York, two individuals named "Micky" and "Michael" would board the airplane with luggage bearing the names of defendants Lewis and Foreman. On the New York to Munich leg of the flight, baggage claim tags would be exchanged by the four travelers so that when the suitcases with the cocaine went through German customs inspection, they would appear to belong to passengers coming from New York, rather than from Bolivia, which was known to the Germans as a source country for cocaine. The informant said that Feld would not continue on the flight to Munich, but would switch planes at Kennedy Airport for a flight to California.

On December 10, 1980, DEA agents learned that defendants Lewis and Foreman had made reservations on Lufthansa Flight # 493 traveling that day from La Paz to Munich via New York. It was also learned that reservations on the New York to Munich leg of Flight # 493 had been made in the names of Michael Muench and Miciala Evans.

On the evening of December 10, 1980, Flight # 493 landed at Kennedy Airport in Queens, New York. According to routine procedures to allow for the cleaning of the aircraft and its refueling in safety, the passengers in transit from La Paz to Munich, including Lewis and Foreman, were removed from the plane and escorted to a lounge adjacent to the boarding ramp. "In-transit" passengers in this lounge are considered to be in a "sterile" area that they may not leave, and are not required to pass through United States Customs prior to the continuation of their international flights. It appears that defendant Foreman, how-

---

1. Kunstler memorandum, dated April 24, 1981, at 6.

ever, sought permission to leave the intransit lounge, but his request was denied.

While the intransit passengers were waiting, Customs inspectors, acting on the basis of the now-corroborated information received from the informant, removed the intransit luggage from the belly of Flight # 493 to a nearby Lufthansa baggage room. There they found two pieces of luggage marked with defendant Muench's name and two pieces marked with co-conspirator Evans' name. In several false compartments in these suitcases the cocaine was discovered.

The results of this seizure, along with the baggage claim numbers of the suitcases containing the contraband, were relayed to the customs agents surveilling defendants Lewis and Foreman in the intransit lounge. When each of the baggage claim tags of Lewis and Foreman matched those of the seized bags, the two were arrested. News of the discovery of the cocaine was also relayed to DEA agents at the Lufthansa boarding area surveilling New York passengers soon to board Flight # 493. The agents approached defendant Muench and Evans and placed them under arrest.

Prior to this time, defendant Feld had disembarked from Flight # 493. Upon presenting himself for clearance through Customs, he was subjected to a thorough but unsuccessful search for contraband. Feld passed through Customs and proceeded to the Eastern Airlines Terminal where he boarded a flight for California. By this time, however, the cocaine had been discovered and DEA agents raced to the Eastern Terminal. Feld was located on board the domestic airplane and placed under arrest.

Defendants' arguments flow from their assertion that the suitcases containing the cocaine never would—nor, indeed, ever could—have been presented to United States Customs for clearance. While not precisely articulated, it appears that their contention has two prongs: first, that this circumstance renders the Court without jurisdiction to proceed on the indictment; and second, that the indictment fails to charge a violation of the laws of the United States. The Court is unable to accept either contention.

Turning to the matter of jurisdiction, it is well settled that a sovereign has jurisdiction to prosecute an offense against its laws even where only a part of that offense has been committed within its boundaries. *United States v. Busic*, 592 F.2d 13, 20 n.4 (2d Cir. 1978). See *Ford v. United States*, 273 U.S. 593, 619–24, 47 S.Ct. 531, 539–541, 71 L.Ed. 793 (1927). As the discussion below demonstrates, the Court is of opinion that each count of the indictment sufficiently charges a crime against the laws of the United States.

It is also clear that all defendants were within the territorial limits of the United States at the time of their arrests during the progress of the crimes alleged. See *United States v. Sindin*, 620 F.2d 87, 90 (5th Cir. 1980). See also *United States v. Postal*, 589 F.2d 862, 885–87 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). Since it appears that at least one part of each offense—the formation of the conspiracy as well as overt acts in its furtherance at Kennedy Airport (count 1); the constructive possession of the cocaine also at the airport, see *United States v. Boney*, 572 F.2d 397, 401 (2d Cir. 1978); *United States v. Catano*, 553 F.2d 497, 500 (5th Cir.), *cert. denied*, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140 (1977)[2] (counts 2 and 4); and the importation of the cocaine (count 3)—was committed within the boundaries of the United States, this Court has jurisdiction to proceed over both the offenses and these defendants. See *Ford v. United States, supra; United States v. Sindin, supra; United States v. Busic, supra*.

---

**2.** The fact that the government agents removed the luggage from the plane to a Lufthansa baggage room did not impair the constructive possession of the suitcases containing the contraband. See *United States v. Williams*, 379 F.2d 319 (2d Cir.), *cert. denied*, 389 U.S. 991, 88 S.Ct. 487, 19 L.Ed.2d 484 (1967); *United States v. Gitlitz*, 368 F.2d 501 (2d Cir.), *cert. denied*, 386 U.S. 1038, 87 S.Ct. 1492, 18 L.Ed.2d 602 (1966).

■ Turning to the contention that the indictment fails to state crimes against the United States, defendants argue that under the circumstances of this case, there was no "importation" as a matter of law; and that the element of intent under 21 U.S.C. § 841(a)(1) requires proof of an intent to distribute *within* the United States, which they assert cannot be proved in this case.

Section 952 of Title 21, U.S.C., provides in relevant part:

"(a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance . . . or narcotic drug . . . ."

For the definition of "customs territory of the United States," 21 U.S.C. § 951(a)(2) makes reference to 19 U.S.C. § 1202, which provides that the term "includes only the States, the District of Columbia and Puerto Rico." It is uncontested, of course, that Kennedy Airport is within the territorial limits of New York State and of the United States. See 21 U.S.C. §§ 802(24) and (26). Nor do defendants make any claim that the search and seizure occurred in some zone expressly excluded from the customs territory of the United States. *Cf. Hawaiian Independent Refinery v. United States*, 460 F.Supp. 1249 (U.S. Customs Court, 1978) ("Customs territory of the United States" does not encompass statutorily excluded "free trade zone"). Indeed, at oral argument counsel conceded that all relevant portions of Kennedy Airport were "customs territory," and stressed instead the improbability of the narcotics *remaining* in the United States. Transcript of proceedings April 25, 1981, at 25, 42.

Nonetheless, defendants argue that the cocaine, even if brought into the customs territory of the United States, cannot be deemed to have been "imported" because it was concealed in the luggage of passengers who never sought, and were not required, to pass customs inspection. They argue that the suitcases were "never brought under the control of the customs authorities" and support their proposition by reference to dicta in *United States v. Pentapati*, 484 F.2d 450 (5th Cir. 1973). However, defendants have not cited, nor has the Court itself found, any case applying what defendants term the "Pentapati exception" and what the Fifth Circuit described as an "elaborate legal construction." 484 F.2d at 450.

■ There is no requirement that a controlled substance actually clear customs in order to be deemed illegally "imported." See, e. g., *United States v. Nieves*, 609 F.2d 642 (2d Cir. 1979). This is so because

"[t]he statute [21 U.S.C. § 952(a)] looks to the *fact* of bringing a controlled narcotic within the territorial jurisdiction of the United States, and not to the alleged importer's subsequent plans." *United States v. Pentapati, supra*, 484 F.2d at 451 (citation omitted; emphasis in original).

See also *United States v. Catano, supra*, 553 F.2d at 500.

Moreover, even if it could be established that defendants Lewis and Foreman had neither the intention nor the capability to remain in the United States with the suitcases containing the cocaine,[3] it would be difficult to say that the baggage was "never brought under the control of customs authorities." Under applicable Air Commerce Regulations, Flight # 493 was required to receive clearance to land and depart from Customs authorities at Kennedy Airport. See 19 C.F.R. §§ 6.1–6.25. See also *United States v. Ivey*, 546 F.2d 139 (5th Cir.), *cert. denied*, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977).

■ With regard to defendants' claim that there must be proof of an intent to distribute *within* the United States, in light of defendant Foreman's attempt to leave the intransit lounge, the Court would be reluctant to say as a matter of law that no

---

**3.** The circumstance of Foreman's apparent attempt to leave the "sterile" area illustrates the inappropriateness of granting a motion to dismiss prior to a fuller factual development of these issues.

reasonable jury could conclude that there was such an intent. In addition, in view of the possibility that the baggage claim tags could have been exchanged before Flight # 493 left United States airspace en route to Munich, and since the constructive transfer of controlled substances can constitute "distribution" under 21 U.S.C. § 841(a)(1), see *United States v. Waller*, 503 F.2d 1014 (7th Cir. 1974), *cert. denied*, 420 U.S. 932, 93 S.Ct. 1137, 43 L.Ed.2d 406 (1975), we conclude that it is for a jury, and not this Court on a motion to dismiss, to determine whether there was an intent to distribute within the United States.

▆▆ In any event, the plain language of 21 U.S.C. § 841(a)(1) suggests no additional requirement of an intent to distribute narcotics inside the United States. See *United States v. Culbert*, 435 U.S. 371, 379, 98 S.Ct. 1112, 1116, 55 L.Ed.2d 349 (1978). Moreover, the provisions of the Drug Act, 21 U.S.C. § 801 *et seq.*, must be construed within the context of relevant international law, which is part of our domestic law. See *The Paquette Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900). See *United States v. Gomez-Tostado*, 597 F.2d 170, 172–73 (9th Cir. 1979) (intent to distribute in a foreign country satisfies 21 U.S.C. § 841(a)(1)). See also *United States v. Madalone*, 492 F.Supp. 916, 920 (S.D.Fla.1980).

Section 801(a) of Title 21, U.S.C., provides:

"The Congress makes the following findings and declarations:

    *     *     *     *     *     *

"Abuse of psychotropic substances has become a phenonomenon common to many countries ... and is not confined to national borders. It is, therefore, essential that the United States cooperate with other nations in establishing effective controls over international traffic in such substances."

The United States is a party to the Single Convention on Narcotic Drugs (18 U.S.T. 1407, T.I.A.S. No. 6298) signed at New York March 30, 1961, ratified by United States, 1967, see 21 U.S.C. § 801(7), which provides a multinational frame-work for coordinated measures to curtail the international distribution of narcotic substances, including cocaine.[4] The Single Convention is not self-executing, but works through the constitutional and legal systems of its signatory nations. Accordingly, Article 36 of the Single Convention contains the following mandate:

"1. Subject to its constitutional limitations, each Party shall adopt such measures as will ensure that ... possession ... offering for sale, distribution, purchase, sale, delivery on any terms whatsoever ... dispatch in transit, transport, importation and exportation of drugs contrary to the provisions of this Convention ... shall be punishable offenses when committed intentionally, and that serious offenses shall be liable to adequate punishment ...."

It is clear that 21 U.S.C. §§ 841, 952 and 955 are among the penal provisions that the United States has adopted to effectuate its treaty obligations under the Single Convention. See *United States v. La Froscia*, 354 F.Supp. 1338, 1341 (S.D.N.Y.), *aff'd*, 485 F.2d 457 (2d Cir. 1973) (*per curiam*); *United States v. Rodriguez-Camacho*, 468 F.2d 1220 (9th Cir.), *cert. denied*, 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1972).

In the light of this international and domestic legislative history, the Court can accept neither defendants' interpretation of the requisite "intent to distribute" nor, as discussed above, their construction of "importation." Such statutory readings would, in these circumstances, effectively decriminalize in this nation the international transportation of a substantial quantity of a dangerous drug. The Court rejects the notion that American nationals may use their country as a vital stopping-over place to effect international cocaine deals and then claim immunity from laws enacted to fulfill

---

**4.** See also the Convention on Psychotropic Substances signed at Vienna, Austria, on February 21, 1971; 21 U.S.C. § 801a.

the obligations of treaties aimed precisely at such narcotics distributions. It is the firm belief of this Court that Congress did not intend such a result.

Accordingly, the motion to dismiss the indictment is denied.

SO ORDERED.