**REPUBLIC OF FRANCE, Plaintiff,**

v.

**Matin Tabatabai MOGHADAM, Defendant.**

**No. CR–85–206 MISC (MHP).**

United States District Court, N.D. California.

Sept. 12, 1985.

Charles B. Burch, Asst. U.S. Atty., San Francisco, Cal., for plaintiff.

Dale A. Drozd, Hallinan, Osterhoudt & Poplack, San Francisco, Cal., for defendant.

## OPINION

PATEL, District Judge.

The instant proceedings were instituted on June 25, 1984 pursuant to a provisional arrest warrant from the Republic of France requesting the extradition of Matin Tabatabai Moghadam to France to stand trial on criminal charges.[1]  Because the unusual and involved factual background of the case is critical, it is set forth in detail below.

*Facts*

In 1983, prior to the incidents leading to this extradition request, Moghadam had been charged with heroin possession in indictments in the Western District of Washington and the Northern District of California.  The Northern District charges were dismissed in December 1983.  Moghadam was placed on probation after a guilty plea to the Washington charges.

On April 10, 1984 two women, Charla Custer and Catherine MacNeil, were arrested during a stopover in Paris while in route from Bombay to San Francisco.  The two women were detained and their luggage was removed from the plane and searched.  Customs agents found 20 grams of opium and 1010 grams of heroin in Custer's luggage.  Also in Custer's possession was a letter written in Farsi implicating Moghadam in the smuggling attempt.

Custer made a statement to the French Magistrate on June 12, 1984.  She claimed that Moghadam had proposed that she go to India to smuggle back heroin for him.  She stated that Moghadam had given her $9,000 and 6 aerosol spray cans for the smuggling and instructed her on the route to take: San Francisco, London, Bombay, Hyderabad, Bombay, Paris, Montreal, San Francisco.  One of the documents seized from Custer was a itinerary that Custer claimed had been written by Moghadam.  Contrary to Custer's testimony, the itinerary laid out the following route: "San Fran-to London?  New Delhie [sic], Inda [sic], New Delhie [sic], Montreal (Not London)-Montreal-Vancouver, S.F."  (Exh. to Government's Submission and Memorandum filed Nov. 16, 1984).  Custer also stated that she had phoned Moghadam twice

---

1.  The French charges against Moghadam are as follows:
  Article 627 of the Public Health Code
  1.  Illicit importation of heroin;
  2.  To have participated in an association or an agreement in order to illicitly import heroin;
    and complicity in offenses (Art 59 and 60 of the Penal Code) for having:

  1.  by donation and promises incite the illicit importation of heroin;
  2.  given instructions to commit this importation;
  3.  furnished the means that served in this action with the knowledge that they would serve that purpose.

from India to tell him that everything was going well.[2]

Custer was confined in a French prison. Sometime shortly after making the above statement she wrote a letter to the Bureau of Narcotics in San Francisco offering to give evidence against Moghadam in exchange for being transferred from the French jail. "... I can give you all the information you want, if you will please get me out of this hell hole, quickly." "[P]lease help me and I will gladly do whatever it takes to help you, even if you wish to put me in jail there I would gladly go, just get me home please."

Subsequently (the chronology of events is not entirely clear), in direct contradiction to her statements to the French officials and her letters to the DEA, Custer wrote a second letter, *fully recanting* her accusations against Moghadam. In the recantation letter she stated that she was addicted to heroin and had been recruited for the smuggling attempt by someone in California named Ali Faszim. Custer stated that she stayed in Bombay with two men named Azim and Hausain; she overheard them saying that if anything went wrong with the smuggling attempt they would blame Moghadam since he was a well-known smuggler; and Azim and Hausain placed the Farsi letter in her purse without her knowledge.

In the recantation letter Custer claimed that she accused Moghadam because she cared for Ali Faszim and did not want her future husband to know about her affair with Faszim. She also claimed to have feared for her life if she talked against Faszim. She concluded, "I have lied forceably against Matin ... and my conscience will not let me rest at ease at this misinjus-

tice [sic] I have caused and I know for a fact that Matin had nothing to do with this deal.... So I must now *stress* that Matin is *completely innocent* of this dealings [sic] and I must retract all previous statements against him and there is absolutely no reason I can testify against him!" (emphasis in original)

In August 1984, Custer wrote to agent Fiorentino,[3] the Drug Enforcement Agency ("DEA") agent assigned to both the previous case against Moghadam in the Northern District of California and the current extradition proceedings. Custer again attempted desperately to arrange her release to the United States in exchange for testimony against Moghadam:

I'm sure the only way to win this battle for my freedom & Matin's arrest is for me to be extradited to San Francisco Federal Prison, where I could be the only witness who could testify, I'm so afraid to do this, because he's so influential, but if I was under 24 hour watch in S.F.P. I am the one only person anywhere who will testify against this man & knew this is the only way to get this problem corrected!.... Can and will you please try to get me extradited back to San Francisco because of these reasons, I'm so lost in this strange land, I'm really trying not to crack up & to write letters like I'm fine ... but it's getting to be impossible, I'm trapped here, with Matin able to fight there....

One last very important, bit request I have is someone must inform Matin that his cousin Azim did this to him & to me, I'm so tired of all this mess, but I refuse to be falsely accused by anyone at anytime longer.[4]

He stated that he responded only once to Custer's letter but had no copies of his letter to her.

---

**2.** Documents from the hotel in Bombay indicate that Custer twice called a number belonging to Moghadam's brother-in-law. Moghadam's sister (who lives at the number called by Custer), testified that William DeFoe, Custer's fiance, was employed as a workman at her home and often received calls there.

**3.** Agent Fiorentino had been in contact with Custer's mother and had given her his name and address. Fiorentino received two or three letters from Custer addressed to him personally.

**4.** In another letter written by Custer to her mother and transmitted to DEA agent Fiorentino, Custer wrote: "I'm still writing the FBI Department of Narcotics in Wash. D.C. and in San Fran. in hopes of getting extridited [sic] out of here to testify against Jean & Matin, Bill's x wife and her new husband." She stated further, "But every penny every day and every pain, these will all be repaid from Matin and Jeanie.

On September 14, 1984 William DeFoe, Custer's fiance, arrived at San Francisco Airport. According to DeFoe's affidavit, he was questioned by agent Fiorentino who told him that he wanted to "nail" Moghadam and that it was unfortunate that Custer had changed her story. Fiorentino also stated that if Custer would withdraw her recantation she would be out of jail in a short time. If not, Fiorentino threatened that she would get seven to eight years.[5]

At the time of his questioning, DeFoe was carrying a copy of the recantation letter from Custer. DeFoe claimed that the letter was seized from him and not returned. Agent Fiorentino testified that he received a copy of the letter. Despite the apparent significance of the total recantation, the government never brought the recantation letter to the attention of the court or the defendant. Defendant learned of the recantation letter through other sources.

Subsequent to the above incident, in September 1984, Custer again wrote to the DEA, this time withdrawing her recantation and re-accusing Moghadam. She explained her recantation by claiming that DeFoe had sent her a letter begging her to tell the truth and exonerate Moghadam and she stated that she feared for DeFoe's life and lied to protect him and herself from Moghadam and his wife Jeanne. This letter is again almost hysterical in tone, accusing Moghadam and his wife of being "unfit citizens in our home, America," and requesting that the agents "please help me, as I will do everything in my power to help you get Moghadam extradited [sic] to France, where he may be put in jail where he belongs."

In approximately December 1984, the court instructed the government to refer the matter to the French judicial officials solely for the purpose of authenticating the recantation letter. The court directed that no further inquiry was to be made of Ms. Custer. The French magistrate interviewed Custer on January 4, 1985. Disregarding the court's instructions, the French Magistrate questioned Custer about the circumstances of the recantation letter. Custer stated that she wrote the letter in June, 1985 after having received a letter from DeFoe asking her to exonerate Moghadam. Once again her story varied from previous recitations. This time Custer claimed that DeFoe told her that if she recanted the accusations, Moghadam would pay her bail to get out of prison. She denied the contents of the recantation and stated that Moghadam had planned her route, instructing her not to go through London or Germany. Custer stated, "For the return flight there were only three possible ways: the first was through London, the second through Germany, and the third by transiting in Paris. Given the instructions I received from Moghadam, I therefore chose the flight transiting in Paris. I believe that Moghadam should have known the itinerary I chose." This version of the itinerary varies from Custer's earlier statement in which she claimed that Moghadam had instructed her to travel to Paris and it varies from the itinerary allegedly written by Moghadam which does not include Paris as a stopover point.

*Discussion:*

■ In order to extradite an individual, the government, on behalf of the requesting nation, must establish the following elements as required by 18 U.S.C. § 3184 and the Treaty of Extradition between the United States and the Republic of France:

1. the existence of an extradition treaty between the United States and France enumerating the crimes with which the extraditee is charged;

Them I am very bitter about and I will make sure when I am out of this zoo ... I will have my vengence [sic] on them and they will know pain and poverty and we will be rich and much stronger, smarter and more knowledgeable because of this time here!"

5. At a court hearing on April 16, 1985 agent Fiorentino admitted that he made the remarks concerning a maximum sentence of seven to eight years if Custer did not return to her original story.

2. that the charges for which extradition is sought are actually pending against defendant in France and are extraditable under the treaty.

3. that the defendant before this court is the same individual sought for trial in France.

4. that there is probable cause to believe that defendant is guilty of the charges pending against him in France.

5. that under the principle of "dual criminality," a. the act alleged to have been committed by defendant is indeed punishable as criminal conduct in France; and b. the same act would be punishable under the criminal law of the United States.

The first and third elements (the existence of a treaty and identity of the individual) have clearly been met and are not in dispute. The second, fourth and fifth elements are discussed below.

*Existence of Formal Charges against Moghadam*

■ The extradition treaty between the United States and France provides that the parties "mutually agree to deliver up persons ... having been charged with or convicted of any of the crimes or offenses specified in the following article...." Treaty Between the United States and France: Extradition, Article I ("Treaty").

Defendant argues that the French magistrate serves an investigative function and the arrest warrant is more like a subpoena than a formal charge. Therefore the actions of the magistrate do not constitute a formal indictment under French law and the treaty requirements are not met.

In *Matter of Assarsson*, 635 F.2d 1237, 1244 (7th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 325 (1981) the court stated that it is appropriate to apply a narrow standard of review in extradition hearings based on respect for the sovereignty of foreign nations and an attempt to avoid error in construing foreign law. Therefore when a treaty does not condition extradition on the filing of *formal* charges, no such formal charges are required and it is sufficient that the person

extradited be "accused." *Id.* at 1242. *See also Matter of Assarsson*, 687 F.2d 1157, 1160 (8th Cir.1982) (declining to review magistrate's conclusion that defendant had been "charged" within the meaning of the treaty because there was no requirement of formal charges in the treaty); *Matter of Assarsson*, 538 F.Supp. 1055, 1057–58 (D.Minn.1982), *aff'd.* 687 F.2d 1157 (8th Cir. 1982).

The relevant documents submitted by the French government include an arrest warrant, a copy of the relevant narcotics laws and a statement of the accusations against Moghadam. In addition there is a statement by the American Charge d'Affaires that Moghadam has been charged with violating French narcotics laws. These documents meet the narrow standard set out by the Seventh and Eighth Circuits and are sufficient to satisfy the requirement that the defendant be "charged with" a crime.

*The Existence of Probable Cause:*

■ Extradition hearings under 18 U.S.C. § 3184 are in the nature of a preliminary hearing where the magistrate need only determine if there is probable cause which justifies the holding of the accused to answer to a charge. *Charlton v. Kelly*, 229 U.S. 447, 460, 33 S.Ct. 945, 949, 57 L.Ed. 1274 (1913); *Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir.1969), *cert. denied*, 398 U.S. 903, 90 S.Ct. 1688, 26 L.Ed.2d 61 (1970).

■ There is no uniform rule by which to determine how much evidence the court should hear. *Charlton*, 229 U.S. at 461, 33 S.Ct. at 949. Therefore the scope of evidence admitted is left to the sound discretion of the court guided by the distinction between contradictory and explanatory evidence set out below. *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978).

Because of the narrow scope of the extradition hearing, the accused cannot introduce evidence which would be admissible at trial on the issue of guilt, but can introduce evidence rebutting probable cause. While

the accused may produce evidence to *explain* matters, the court may exclude evidence which merely contradicts government testimony, poses conflicts of credibility or establishes a defense. *See Collins v. Loisel,* 259 U.S. 309, 315–16, 42 S.Ct. 469, 471–72, 66 L.Ed. 956 (1922) (permissible evidence is that "which might have explained ambiguities or doubtful elements in the prima facie case ..." and excludable evidence is that relating strictly to the defense.); *Hooker v. Klein,* 573 F.2d at 1369 ("evidence of facts contradicting the demanding country's proof or establishing a defense may properly be excluded."); *Matter of Sindona,* 450 F.Supp. 672, 685 (S.D. N.Y.1978) ("the accused has no right to introduce evidence which merely contradicts the demanding country's proof, or which only poses conflicts of credibility").

Courts have struggled to clarify the distinction. In *Sindona,* 450 F.Supp. at 685, the court stated that explanatory evidence is "reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause.... The decisions are emphatic that the extraditee cannot be allowed to turn the extradition hearing into a full trial on the merits." *Shapiro v. Ferrandina,*

355 F.Supp. 563, 572 (S.D.N.Y.) *modified and affirmed,* 478 F.2d 894 (2d Cir.) *cert. diss'd,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973) held that the magistrate should permit evidence that "tends to obliterate probable cause ... but not what merely contradicts it. The improbability or the vagueness of testimony may destroy the probability of guilt, but the tendering of witnesses who testify to an opposite version of the facts does not."

▬ The probable cause standard applicable in extradition proceedings is defined under Federal law. *Sindona v. Grant,* 619 F.2d 167, 175 (2d Cir.1980). Defendant argues that the government has not met the federal probable cause standard which requires "evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C.Cir. 1973). Moghadam relies principally on the existence of the recantation letter as obliterating probable cause. In addition he stresses the conduct of law enforcement officials in this country, especially what he considers to be overreaching on the part of the United States government in seeking extradition to France.[6]

---

**6.** Defendant alleges the following as evidence of overreaching and examples of government misconduct:

1. Moghadam received a probationary sentence in federal court in late 1983. Soon after federal agents began to "harass" Moghadam. He was arrested by INS agents pursuant to a deportation warrant; he was taken to the strike force office and subjected to "grilling" without an attorney and was told that the government would "get" him.

2. The French magistrate in her warrant referred to Moghadam's wife incorrectly by the name of a woman who had been a witness against Moghadam in the deportation hearings but had no connection to the extradition case. Moghadam's attorney states that he knows of no way the magistrate could have known of the name of that woman unless federal agents were involved in the French proceedings.

3. When extradition proceedings began, the same United States Attorney and the same DEA agent who had prosecuted Moghadam in this district represented the government in the extradition proceedings.

4. William DeFoe, Custer's fiance, when questioned by agent Fiorentino was told by

Fiorentino that he would "nail" Moghadam personally. The agent also told DeFoe that if Custer refused to withdraw her recantation letter he would see that she spent seven to eight years in a French prison.

5. The recantation letter was seized from DeFoe and not returned to him.

6. The government agents did not bring the recantation to the court's attention and actually confiscated and suppressed evidence relevant to probable cause.

7. Government agents had contact with Custer following her incarceration.

8. The French government questioned Custer concerning her recantation letter after this court had explicitly instructed the government that Custer was not to be questioned beyond simply authenticating the letter.

Certain of the above allegations are in dispute. Others do not rise to the level of affirmative governmental misconduct. While the court finds the government's conduct in this case disturbing, it does not rise to the level justifying denial of extradition solely for that reason. However, the government's conduct will be considered in determining probable cause.

The most significant aspect of the probable cause determination is Custer's recantation letter which was later withdrawn. In *Application of D'Amico*, 185 F.Supp. 925, 930 (S.D.N.Y.1960), *appeal diss'd sub nom. United States ex rel D'Amico v. Bishopp*, 286 F.2d 320 (2d Cir.), *cert. denied sub nom. Farace v. D'Amico*, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1254 (1961) the court considered the fact that testimony against the defendant was recanted by the witness. The court stated that the "testimony of an accomplice is to be viewed with healthy scepticism.... Where, as here, such testimony has been completely recanted, its probative value is thin indeed." Because of the recantation, the court held that there was grave doubt as to whether the evidence demonstrated reasonable grounds to believe defendant was guilty of the charged crime.

The Seventh Circuit has held that a court is entitled to exclude recantations of earlier statements on the grounds that the recantation merely contradicted or challenged the credibility of facts implicating the extraditee, *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir.) *cert. denied* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). The facts of *Eain*, however, are distinguishable from the instant case. In *Eain* defendants had made inculpatory statements before an Israeli police officer sworn to be true before an Arabic speaking judge who conversed with defendants in Arabic and determined that they understood their statements and made the confessions of their own free will. The offered recantations, in contrast, were made to private counsel while the defendants were in prison. *Id.* The original statements therefore had more indicia of reliability than the recantations. The instant factual situation is the opposite. Custer's initial statement made before a French magistrate was self-serving since she attempted to shift the bulk of the blame to Moghadam. Subsequently she used her accusations against Moghadam as a bargaining chip with the DEA and in fact offered to "do whatever it takes" to get out of the "hell hole" of a French jail. In contrast the recantation was not self-serving in any fashion. In fact, quite to the contrary, the recantation went against Custer's self interest in being transferred from the French jail. Thus Custer's recantation appears to have more indicia of reliability than the original accusations. *See United States v. Estrada*, 733 F.2d 683, 686 (9th Cir.), *cert. denied*, — U.S. —, 105 S:Ct. 168, 83 L.Ed.2d 103 (1984) (statements against interest by informant carry added indicia of reliability).

The recantation evidence here is critical and must be given substantial consideration for it goes to more than just the credibility of a witness, it negates the only evidence of probable cause. Furthermore, the substance and circumstances of the recantation indicate that it has more indicia of reliability than the original accusations.

Charla Custer subsequently withdrew her recantation under circumstances that are not entirely clear. There is at least some evidence of a veiled "threat" by the government that if Custer did not withdraw her recantation she would spend substantial time in the French jail. The whole of Custer's behavior, including her initial desperation to strike a deal in order to be transferred from France, the almost hysterical tone of her accusations, her subsequent spontaneous and total recantation of the accusations and the unexpected withdrawal of that recantation relate to more than just her credibility as a witness. These facts are relevant to her basic competence to testify and the inherent reliability of the only evidence tending to show probable cause. This is more than a self-serving recantation or "the mere presentation of witnesses who testify as to an opposite version of facts;" it is evidence that goes to the "improbability or vagueness of testimony" that may destroy the probability of guilt. *Freedman v. United States*, 437 F.Supp. 1252, 1266 (N.D.Ga.1977). *See also Shapiro v. Ferrandina*, 355 F.Supp. at 572.

Furthermore, the instant situation presents special concerns that demand a heightened scrutiny by this court in the interest of justice. Prior to the extradition,

the government was in the midst of instituting deportation proceedings against Moghadam, but was stymied because there was no country willing to accept him and Iran (his native land) is not a country to which he may be deported because of the political condition there. If Moghadam is extradited to France, even if found innocent of the charges against him in that country, he will not be able to reenter the United States where his wife and child reside. The harsh results of an erroneous extradition based on untrustworthy accusations militate against this court's applying too lenient a standard of review in determining probable cause.

The government argues that there is corroborating evidence for Custer's testimony, including the statement of Catherine Mac-Neil (Custer's traveling companion) implicating Moghadam; the letter written in Farsi seized from Custer implicating Moghadam; hotel records showing that Custer telephoned a number connected to Moghadam; and the fact that Moghadam has a recent conviction for heroin importation. Most of this evidence, however, is either ambiguous or was explained away by the recantation.

Furthermore, the fact that the government appears to have been somewhat overzealous in the extradition proceedings, while not rising to the level of clear misconduct, also casts doubt on the presence of probable cause.[7] Custer was aware that the government was anxious to extradite Moghadam and she clearly attempted to profit from that prosecutorial zeal. Agent Fiorentino admittedly stated to Custer's fiance, DeFoe, that it was unfortunate that she had recanted and if she did not return to her original story she might serve seven to eight years in French prison. It is only reasonable to presume that Custer learned of this veiled "threat" and may have been influenced by it in the withdrawal of her recantation. These circumstances cast additional doubt on what is already highly questionable evidence.

For all of the above reasons, the court concludes that the government has failed to meet its burden of showing probable cause to extradite Moghadam to France.

### The Principle of Dual Criminality:

■ Under the doctrine of dual criminality, the particular act charged must be criminal in both the requesting and the extraditing jurisdictions in order to justify extradition. *Collins v. Loisel*, 259 U.S. 309, 312, 42 S.Ct. 469, 470, 66 L.Ed. 956 (1922). The extradition treaty between France and the United States explicitly incorporates this principle by providing that: "Extradition shall be granted for the following acts if they are punished as crimes or offense by the laws of both States." Supplementary Convention to the Extradition Convention of January 6, 1909 between the United States of America and France, Article II (1970). A related provision states that no individual will be extradited except:

> upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offense had been there committed.

Treaty, Article I

The principle of dual criminality does not require that the charges be identical, but only that the acts be punishable in each country. (The "law does not require that the name by which the crime is described in the two countries shall be the same; nor

---

**7.** It is clear from the government's comments in this case that it is more than a little dissatisfied with the sentence imposed by the Western District of Washington. In its eagerness to proceed against Moghadam in the extradition matter the government failed to comply with treaty requirements and a motion to quash was granted. The interest of France in obtaining Moghadam's extradition and prosecuting him is also inexplicable. Moghadam has not set foot on French soil or injected himself into France in any way in connection with the claimed offense. Yet if he is extradited to France, that country may well remain his permanent abode for he cannot reenter the United States. Also, as observed herein, Custer's bags were apparently removed from the plane and searched even though she was not passing through French customs and France was not a destination or stopover for her.

that the scope of the liability shall be coextensive...." *Collins,* 259 U.S. at 312, 42 S.Ct. at 470–71.) *See also Hu Yau-Leung v. Soscia,* 649 F.2d 914, 918 (2d Cir.), *cert. denied,* 454 U.S. 971, 102 S.Ct. 519, 70 L.Ed.2d 389 (1981) (the proper inquiry is "if the individual had committed the same acts in the United States would a crime have been committed ...") Therefore the court rejects defendant's argument that Moghadam is charged as a principal in France, a charge that would not be upheld in this country. The French charges, while not explicitly using the word conspiracy, logically amount to the equivalent of conspiracy in this country.[8]

In analyzing Moghadam's liability as a conspirator, the court must first consider the criminality of Custer's acts and whether the United States would assert jurisdiction to punish Custer's conduct had it occurred within United States borders. The government claims that Custer's acts would have violated 21 U.S.C. § 846 which proscribes conspiracy to distribute, manufacture and possess with intent to distribute controlled substances and 21 U.S.C. §§ 963 and 952 which proscribe conspiracy to import controlled substances into the United States.

Several cases have imposed liability on defendants for transporting contraband *through* the United States. In *United States v. Gomez-Tostado,* 597 F.2d 170 (9th Cir.1979), defendant was apprehended in the United States while transporting heroin from one area of Mexico to another. The court held that he could be convicted for possession with the intent to distribute a controlled substance under 21 U.S.C. § 841(a)(1) even though the intended distribution point was in Mexico. *Id.* at 172–73. In *United States v. Feld,* 514 F.Supp. 283 (E.D.N.Y.1981), defendants attempted to smuggle cocaine from South America to Germany via New York. Customs inspectors removed defendants' luggage from the plane in New York and discovered the drugs. The court held that 21 U.S.C. § 841(a)(1) did not require any intent to distribute narcotics inside the United States. Since the formation of the conspiracy as well as overt acts in its furtherance (defendants intended to switch luggage tags in New York) were committed within United States borders, jurisdiction was proper. The court based its conclusion in part on the Single Convention on Narcotic Drugs, 18 U.S.T. 1407, T.I.A.S. No. 6298, ratified by the United States, *see* 21 U.S.C. § 801(7) which mandates that parties to the treaty shall adopt measures to insure that dispatch in transit, transport, importation and exportation of drugs is a punishable offense. *Id.* at 287–88. Finally, in *United States v. Madalone,* 492 F.Supp. 916 (S.D. Fla.1980) defendant was arrested in Miami Airport while traveling between Nassau and Montreal. Heroin was discovered in his luggage which had been checked through United States customs in Nassau to Montreal. *Id.* at 918. The court held that defendant's behavior amounted to importation of contraband into the United States and as such was criminal under United States laws. "[T]he importation of heroin for transportation through the United States affects its commerce irrespective of whether it is eventually distributed in the United States." *Id.* at 919.[9]

---

**8.** The French charges appear to amount to the equivalent of a conspiracy charge as evidenced by the following: 1. the arrest warrant states that Moghadam is charged with "complicity" and "an interest in" commission of narcotics offenses; 2. one of the statutes referred to states that an attempt to commit a substantive offense or an "association" or "the agreement" to commit a substantive offense is punishable; 3. the magistrate cites Article 399 of the French Customs Code which applies to any person who is an "interested" party in the smuggling of drugs. Section 2a defines interested party as the owner of the smuggled goods or someone who acts in agreement according to a preconceived plan.

**9.** In justifying its conclusion the court pointed both to the indirect effect on our relations with other nations and to the direct effect of permitting the United States to be used as a conduit— once the contraband entered the country, the United States would be at the mercy of the "good intentions" of smugglers not to distribute within the United States. Furthermore, there would be an increased potential for violence within this country. *Madalone,* 492 F.Supp. at 919.

While the cases suggest that Custer's actions might be considered criminal under the laws of this country, liability is far from clear and there are important factual distinctions between the instant case and cases relied on by the government. In *Gomez-Tostada* the transportation across United States territory was part of an established smuggling pattern designed to avoid Mexican roadblocks. 497 F.2d at 172. In addition the amount of time spent in United States territory (travel between Texas and California) was substantial and the opportunity for a smuggler to cause a dangerous and detrimental effect in this country was significant. In contrast, the instant case does not involve an established smuggling pattern and the amount of time spent in France was insubstantial.

In *Feld* the court relied on the fact that the conspiracy was formed and overt acts in its furtherance were committed within United States borders. 514 F.Supp. at 286. (Two individuals boarded the airplane in New York with luggage bearing the names of the defendants. The defendants were to then switch the luggage tags so that it would appear they were arriving from New York rather than Bolivia. *Id.* at 285.) In contrast, the conspiracy here was *not* formed in France and no overt acts were taken by Custer in France. She was simply a passenger in-transit, who as far as the court can determine, did not even attempt to stopover in France.

Finally, in *Madalone*, defendant actually went through United States customs in Nassau. 492 F.Supp. at 918. Custer made no attempt to clear French customs at any time.

The distinction between a defendant who causes an effect in the stopover country and a "true in-transit passenger who is never brought under the control of the customs authorities," and therefore could not "import" any substance into the United States was suggested by the court in *United States v. Pentapati*, 484 F.2d 450, 451 (5th Cir.1973). The *Pentapati* court did

not directly reach the validity of this distinction since the defendants were arrested while clearing customs, and were therefore not true in-transit passengers. *Id.* The distinction was examined, but also not directly reached by the district court in *Madalone*, 492 F.Supp. at 919. The court suggested that if an in-transit distinction did exist, it would be limited to situations in which "the passenger and—by extension—the baggage are 'never brought under the control of the customs authorities.'" (quoting *Pentapati*, 484 F.2d at 451). *Cf. United States v. Sindin*, 620 F.2d 87 (5th Cir.1980). (Defendant was arrested while going through customs. Court rejected defendant's argument that he was purely an international in-transit passenger. "Sinden was within the territorial limits of the United States at the time of his visit even though he had not left the custody of the customs area." *Id.* at 90).

Charla Custer fits into the category of the true in-transit passenger since there is no evidence that she attempted to clear customs or to stopover at the Paris airport. Under the *Pentapati* distinction, she therefore would not be guilty of smuggling and Moghadam, correspondingly, could not be held liable as a conspirator.

This court need not, however, specifically recognize an in-transit exception to the assertion of jurisdiction since even assuming that Custer would be liable under United States law for importing heroin, the court concludes that the exercise of extraterritorial jurisdiction by this country over Moghadam (under analogous circumstances) would be unreasonable. Hence the requirements of dual criminality are not met.

Unlike Custer, Moghadam's acts were committed outside of the jurisdiction of the country requesting extradition. There are five theories justifying the extraterritorial application of penal laws. *United States v. King*, 552 F.2d 833, 850–51 (9th Cir.1976) *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).[10] The government re-

---

**10.** The five theories are: 1. territorial—jurisdiction based on where the offense is commit-

ted; 2. nationality—jurisdiction based on the nationality of the person committing the of-

lies on the territorial theory in which jurisdiction can be asserted over conduct taking place within the territorial boundaries of the country. This basis for jurisdiction has been extended to apply even to "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it...." *Id.* at 851–52 (quoting *Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911)) (emphasis added).

■ General conspiracy law provides that a "defendant is vicariously liable for the substantive acts of her coconspirators whether or not she directly participates in such acts, so long as those acts are committed pursuant to and in furtherance of the conspiracy." *United States v. Saavedra,* 684 F.2d 1293, 1300 (9th Cir.1982). Furthermore, the court may assert jurisdiction over a defendant whose acts were done outside of the United States if his co-conspirators committed acts in furtherance of the conspiracy in the United States and if he intended to produce detrimental effects within the United States. *Chua Han Mow v. United States,* 730 F.2d 1308, 1311–12 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985). *See also United States v. Schmucker-Bula,* 609 F.2d 399 (7th Cir.1980) (court has jurisdiction over conspiracies when one of conspirators commits overt act within territorial jurisdiction of the country. *Id.* at 402).

■ However, even if Moghadam could technically be held liable for Custer's acts under a conspiracy theory, the extraterritorial exercise of jurisdiction must be reasonable. In *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 923 (D.C.Cir.1984) the court stated that "[a]s

long as the territorial effects are not so inconsequential as to exceed the bounds of reasonableness imposed by international law, prescriptive jurisdiction is legitimately exercised," *id.* at 923 (citation omitted), and "[j]urisdiction exists only when *significant* effects were intended within the prescribing territory". *Id.* (emphasis added).

The territorial effects in the instant case are minimal.[11] The transportation of heroin through France was not part of an established smuggling pattern; Custer did not attempt to clear customs or to enter France in any manner. Furthermore there is no proof of any intent on the part of Moghadam to cause effects in France. Moghadam neither entered France nor even telephoned into France. In fact it is not clear that he instructed Custer to take a flight with a stopover in France. Custer's testimony is contradictory in this respect and like most of her testimony, is inherently unreliable. The only piece of documentary evidence allegedly connected with Moghadam indicates that indeed he did not instruct Custer to fly through France.

In this respect the instant case is distinguishable from *Chua Han Mow* and *Schmucker-Bula.* In both of the above cases, defendant conspired to import drugs into the United States. The intent to cause a detrimental effect was clear.

The government relies on *Melia v. United States,* 667 F.2d 300 (2d Cir.1981) in arguing that the exercise of jurisdiction would be proper in the instant case. In *Melia* an Italian citizen residing in the United States conspired with individuals in Canada to murder someone in the United States. Melia called one of the co-conspirators in Canada in furtherance of the con-

fense; 3. protective—jurisdiction based on national interest injured; 4. universality—jurisdiction based on custody of the accused; and 5. passive personality—jurisdiction based on the nationality of the person injured. *Rocha v. United States,* 288 F.2d 545, 549 n. 4 (9th Cir.) *cert. denied* 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961).

11. This court acknowledges that detrimental effects can be caused by drug transportation across the borders of a country and such effects

can be inferred from Congressional intent to cooperate with other nations in controlling international traffic in drugs, 21 U.S.C. § 801a(1), and from the 1961 Single Convention on Narcotics Drugs.

However, in the instant case, because Custer was a true in-transit passenger, it is not clear that she could have been held liable for importing drugs. If liability is imposed, it hangs on a filament at best.

spiracy, but had no other contacts with Canada. The court held that Melia was extraditable to Canada based on the conspiracy to commit murder charge, since conspiring with persons in Canada was a sufficient nexus to support Canadian jurisdiction and there was evidence that Melia had made one or more phone calls to Canada. *Id.* at 303. In its analysis, the court determined that the United States would have jurisdiction under similar circumstances both because the mere presence of a conspiracy within a country has a detrimental effect and because Melia performed acts within Canada (the telephone calls) that furthered the conspiracy. *Id.* at 304. Moghadam neither conspired with anyone in France nor performed any overt acts in France. There is absolutely no evidence to demonstrate that Moghadam intended to cause any detrimental effects in France. Under these circumstances it would be clearly unreasonable for a court in this country to exercise jurisdiction over Moghadam. *See Laker*, 731 F.2d at 923.

The government has failed to show either the existence of probable cause or that the courts of this country would be entitled to exercise jurisdiction over Moghadam for the alleged acts of conspiracy committed outside of the country. The principle of dual criminality is not met. The court therefore declines to grant the extradition request.

IT IS SO ORDERED.